## Carl U. EGGLESTON

### v.

### PRINCE EDWARD VOLUNTEER RESCUE SQUAD, INC., et al.

### Civ. A. No. 83–0047–R.

United States District Court,
E.D. Virginia,
Richmond Division.

Aug. 8, 1983.

D. Brock Green, Wyatt, Rosenfield &
Green, Charlottesville, Va., for plaintiff.

William B. Cave, Charles Midkiff, Chris-
tian, Barton, Epps, Brent & Chappell, Rich-
mond, Va., for defendants.

## OPINION

WARRINER, District Judge.

Plaintiff has sued defendants for compen-
satory and injunctive relief alleging viola-

tion of his constitutional rights by defendants' action in expelling plaintiff from membership in defendant Rescue Squad. Plaintiff brings his suit under 42 U.S.C. §§ 1981, 1983 and 1985(3). The Court has before it defendants' ripe motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Both parties having filed exhibits, affidavits, and depositions, defendants' 12(b)(6) motion is treated as a motion for summary judgment pursuant to Rule 12(b).

The following material facts are undisputed. Defendant Prince Edward Volunteer Rescue Squad, Inc., located in Prince Edward County, Virginia, is a private non-profit corporation whose purpose is to provide emergency medical transportation and services to the community without charge. Prior to 12 May 1982, plaintiff Carl U. Eggleston, a black man, had held positions in defendant Rescue Squad as officer, executive committee member, and general member.

On 14 January 1982, John Thompson, a white member of the Rescue Squad, used the term "niggers" in the presence of plaintiff and other members of the Rescue Squad. Plaintiff sought some official action on behalf of defendant Rescue Squad against Thompson for his racially derogatory remark. On 14 April 1982, plaintiff moved the Executive Committee and then, at the Committee's direction, moved the general membership, to suspend Thompson from the Rescue Squad for six months. Plaintiff's motion failed for lack of a second. On 11 May 1982, plaintiff appeared before the Prince Edward County Board of Supervisors, advised the Board of Thompson's remark and of the membership's inaction, and requested that the County withhold any donation to the Squad pending disciplinary action against Thompson.

The following day, 12 May 1982, at the Rescue Squad's general membership meeting, a motion was made by defendant Baldwin, seconded by defendant Davis, and adopted by a sixteen to two vote of the general membership to dismiss plaintiff from the Rescue Squad. The amended complaint alleges that all individual defendants participated in the decision to dismiss

plaintiff and implies the vote to dismiss plaintiff was split along racial lines, there being only two voting black members present.

According to the amended complaint, plaintiff was expelled from the Rescue Squad because he appeared before the Board of Supervisors, because he did not keep his grievance "within the Squad," and because he is black and was protecting the rights and dignity of black people. Defendants assert that plaintiff was dismissed for the "good of the organization" pursuant to the Rescue Squad's constitution and by-laws.

Membership in the Rescue Squad is voluntary and members receive no remuneration for their services. The Rescue Squad owns the building from which it operates and the equipment it uses. In 1982 Prince Edward County (the County) contributed $6,000 to the Rescue Squad; the County has contributed some funds every year since the Squad's inception. The Squad's operating budget in 1982 was $48,000, most of which came from private contributions. That same year the Town of Farmville (the Town) contributed gasoline for the Squad's vehicles and water for its building. The Town provides free dispatching services to the Squad through the Police Department's "911" emergency number. The value of the Town's contributions is roughly equal to the County's. The Rescue Squad's real and personal property are exempt by law from State and local taxation. The Rescue Squad holds State operational and emergency medical service vehicle permits and follows State regulations concerning record keeping, sanitation, and maintenance of its vehicles and the medical equipment and supplies required to be carried thereon. Rescue Squad members receive free private vehicle permits from the Town and from the County.

During 1981 and 1982 defendant Rescue Squad received $6,148 in federally-funded matching grants for equipment purchases. The distribution of these federal funds was administered by the Old Dominion Emergency Medical Services Alliance, Inc.

(ODEMSA), whose Board has complete discretion in deciding which emergency medical services organizations will receive these grants. ODEMSA is a private non-profit corporation but was designated pursuant to State law to receive and disburse public funds.

The General Assembly has provided that local governing bodies may adopt ordinances for the purpose of controlling through franchises and permits the rendering of local emergency transportation services. Va.Code § 32.1–156. The General Assembly has also provided that the political subdivision housing the Rescue Squad's principal office may adopt a resolution acknowledging Rescue Squad members as employees of the political subdivision for workmen's compensation coverage. Va.Code § 65.1–4.1. Neither the County nor the Town has adopted such ordinance or resolution.

Neither the County nor the State controls the internal operation or membership activities of the Rescue Squad. The Squad receives no funds from the State, receives no free oil for its vehicles from the Town, and its gasoline is not exempt from taxation under State law. Rescue Squad members are not classified as employees of the Town or County and are not covered by the workmen's compensation insurance of either.[1]

## I. SECTION 1983

The amended complaint alleges that in dismissing plaintiff from the Rescue Squad, defendants acted under color of State law to deprive plaintiff of his First, Fifth, and Fourteenth Amendment rights of free speech, to petition the government for redress of grievances, to equal protection of the laws, and to due process of the law in violation of 42 U.S.C. § 1983. Two elements are required to establish a § 1983 claim:

> First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' of the United States. Second, the plaintiff must show that the defendant deprived him of this constitutional right 'under

color of any statute, ordinance, regulation, custom, or usage, of any State or territory.'

*Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970).

### A. State Action Requirement

The First and Fifth Amendments prohibit the federal government from infringing on the rights that plaintiff claims. Likewise "the Fourteenth Amendment, which prohibits the states from denying federal constitutional rights and which guarantees due process, applies to acts of the states, not to acts of private persons or entities." *Rendell-Baker v. Kohn,* 457 U.S. 830, 837, 102 S.Ct. 2764, 2769–70, 73 L.Ed.2d 418, 425 (1982), *citing Civil Rights Cases,* 109 U.S. 3, 11, 3 S.Ct. 18, 21, 27 L.Ed. 835 (1883). "And § 1983, which was enacted pursuant to the authority of Congress to enforce the Fourteenth Amendment, prohibits interference with federal rights under color of State law." *Id.* "In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'State action' required under the Fourteenth Amendment." *Id.* 457 U.S. at 838, 102 S.Ct. at 2770, 73 L.Ed.2d at 426, *quoting United States v. Price,* 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966); *see Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929–932, 102 S.Ct. 2744, 2750–51, 73 L.Ed.2d 482, 491–92 (1982).

"The ultimate issue in determining whether a [private entity] is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights 'fairly attributable to the State?'" *Rendell-Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418, 426 (1982). The central issue upon which the parties contend is not whether plaintiff was dismissed because of his exercise of his rights of free speech and to petition the government, or because he is black, or without adequate procedural protections, but whether the action of the Rescue Squad and

---

1. The facts contained in this paragraph are supported by defendants' credible affidavits and exhibits, which plaintiff has not contradicted.

of the individual defendants in dismissing plaintiff can fairly be viewed as "State action." *Id.*

### 1. *Lugar* Test

The Supreme Court has enunciated a number of tests for determining when the actions of a private entity or person may be considered State action. Defendants urge the Court to accept the two-tiered test described by the Supreme Court in *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), as the standard.[2]

 *Lugar* was a § 1983 suit challenging a private creditor's prejudgment attachment of a debtor's property. The Supreme

Court explicitly limited its holding in *Lugar* to the "particular context of prejudgment attachment."[3] *Id.* at 939, 102 S.Ct. at 2755, 73 L.Ed.2d at 497 n. 21; *see Deal v. Newport Datsun Ltd.,* 706 F.2d 141 at 142 (4th Cir.1983). In addition to the prejudgment attachment limitation, *Lugar* requires a specific challenge to a State statute as procedurally defective under the Fourteenth Amendment's due process clause; private misuse of a proper State statute is not conduct that can be attributed to the State. *Id.* 457 U.S. at 941, 102 S.Ct. at 2756, 73 L.Ed.2d at 498. Since the instant case does not involve prejudgment attachment or a challenge to any State law, defendants' reliance on the *Lugar* test is misplaced.[4]

**2.** In *Lugar,* the Supreme Court articulated a two-part approach to the question of whether the conduct allegedly causing the deprivation of a federal right is fairly attributable to the State:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible. . . . Second, the party charged with the deprivation must be a person who may fairly be said to be a State actor. This may be because he is a State official, because he has acted together with or has obtained significant aid from State officials, or because his conduct is otherwise chargeable to the State.

*Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 936, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482, 495 (1982).

**3.** By holding in *Lugar* that a private citizen's simple act of employing apparently valid State legal procedures may open him to liability in a § 1983 suit for any constitutional deprivation that may result, the Supreme Court created the potential to expand the reach of § 1983 to almost limitless dimensions. *See Lugar, supra,* at 940, 952 n. 8, 102 S.Ct. at 2756, 2762 n. 8, 73 L.Ed.2d at 498, 505 n. 8 (Powell, J., dissenting). This was accomplished despite language in *Lugar* to the effect that State action evinces judicial recognition that most constitutional rights are protected only against *governmental* infringement. *Id.* at 936, 102 S.Ct. at 2754, 73 L.Ed.2d at 495 (emphasis added). As the Court itself notes: "Careful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power. . . . A major consequence is to require the courts to respect the limits of their own power as directed against state governments and private interests." *Id.* The Supreme Court's limitation, via

a footnote, of its holding in *Lugar* to prejudgment attachment cases falls short of obviating the potential expansion such a holding engenders. *Compare id.,* at 939, 102 S.Ct. at 2755 n. 21, 73 L.Ed.2d at 497 n. 21 *with id.* at 952 n. 8, 102 S.Ct. at 2762 n. 8, 73 L.Ed.2d at 505 n. 8 (Powell, J., dissenting).

The Supreme Court turned more restrictive in its application of State action in *Rendell-Baker v. Kohn, supra,* and *Blum v. Yaretsky,* 457 U.S. 852, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). The case before this Court is more akin to these latter two Supreme Court cases than to *Lugar.*

**4.** Even if defendants could surpass the limitations of *Lugar,* the outcome would be no different. Where as here, no State official or private party acting with a State official is involved, the Supreme Court refers to *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) for the answer to the first tier of the *Lugar* test: whether the deprivation has been caused by the exercise of a State right. *See Lugar, supra,* 457 U.S. at 936, 102 S.Ct. at 2754, 73 L.Ed.2d at 496. Thus in the circumstances presented here, even under *Lugar* a nexus must exist between the State and the challenged action of the Rescue Squad for the actions of the latter to be "fairly attributable" to the former. *Moose Lodge, supra,* 407 U.S. at 176, 92 S.Ct. at 1973; *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974). *See* discussion p. 1349, *infra.*

Looking to the second tier of the *Lugar* test, the only category of State action in which defendants might fall is that of a private entity whose "conduct is otherwise chargeable to the State." *Lugar, supra* at 495. But the Fourth Circuit, in *Adams v. Bain,* 697 F.2d 1213 (4th Cir.1982), has equated this category of State

### 2. Symbiotic Relationship Test

 The facts alleged in the amended complaint clearly fail to establish between defendants and the State a "symbiotic relationship" such as the one found to exist in *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). The Supreme Court specifically limited its holding in *Burton* to relationships similar to that in *Burton:* a State lessor and a private lessee with the business of each contributing to the business of the other. *Id.* 365 U.S. at 726, 81 S.Ct. at 862; *see Rendell-Baker v. Kohn,* 457 U.S. 830, 842, 102 S.Ct. 2764, 2772, 73 L.Ed.2d 418, 428 (1982). The building from which the Rescue Squad operates is owned exclusively by the Rescue Squad. The equipment it uses, likewise, is titled in the Rescue Squad. The Rescue Squad has no symbiotic relationship with any governmental entity.

### 3. Indicia of State Action

Plaintiff acknowledges that the instant case does not fit easily under any of the Supreme Court's tests, but points to the fact that defendant Rescue Squad possesses many overlapping indicia of State action that taken together support a finding of State action in defendants' conduct in discharging plaintiff. Plaintiff contends that as a result of defendant Rescue Squad's close association with the State through (1) extensive State regulation, (2) the performance of a "public function," and (3) significant government support, defendants engaged in State action in dismissing plaintiff. These are the same factors considered by the Supreme Court to determine whether discharge decisions of the private school in *Rendell-Baker v. Kohn,* 457 U.S. 840, 841, 102 S.Ct. 2764, 2771, 73 L.Ed.2d 418, 427 (1982), and transfer decisions by private nursing homes in *Blum v. Yaretsky,* 457 U.S. 991, 1003, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534, 546 (1982), could be fairly attributable to the State. In both cases the Supreme Court rejected the argument.

### a. State Regulation

First, plaintiff asserts that regulation by the State converts action by the Rescue Squad into State action within the meaning of § 1983. In his brief plaintiff lists a myriad of ways in which the State, through statutes and administrative regulations, has allegedly "so injected itself into the daily activities of defendant Rescue Squad" that the actions of the Squad must be considered those of the State.

 But the Supreme Court has said that regulation of a private entity by the State, even if "extensive and detailed," is insufficient to establish State action. *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 350, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974). Rather, "the inquiry must be whether there is a sufficiently close nexus between the State and the *challenged action* of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id.* at 351, 95 S.Ct. at 453, *citing Moose Lodge 107 v. Irvis,* 407 U.S. 163, 176, 92 S.Ct. 1965, 1973, 32 L.Ed.2d 627 (1972) (emphasis added). *Moose Lodge* stood for the proposition that absent regulations encouraging or requiring the challenged action itself, State regulation of other activities of a defendant does not make the challenged action State action. *See Fike v. United Methodist Children's Home of Virginia, Inc.,* 547 F.Supp. 286, 292 (E.D.Va.1982), *aff'd,* 709 F.2d 284 (4th Cir.1983). *Moose Lodge* involved a racially motivated refusal to serve whiskey to a Negro in a private club located on private property. Plaintiff argued that regulation by the State Liquor Board of the sale of alcoholic beverages in the club converted the refusal to serve into State action. The Supreme Court disagreed. In *Jackson,* plaintiff alleged that a privately owned utility company's termination of electric service to her home for nonpayment of bills was State action because of the extensive and pervasive regulation of the utility company by the State. In *Jackson* the very process by which the utility determined plaintiff's electricity should be cut off had

---

actor with exercising a "traditional public function." *Id.* at 1218. As the Court explains,

*infra,* emergency transportation services do not pass the public function test.

been approved by the State. Again the Court found no nexus between the State and the challenged action.

The Supreme Court recently has relied on the nexus test of *Jackson* to find no State action despite pervasive State regulation. In *Blum v. Yaretsky* the State was indirectly involved in the challenged decisions to transfer nursing home patients to less expensive facilities and the nursing homes were extensively regulated in other ways as well. No State action was found. In *Rendell-Baker* the Supreme Court found that the school's decisions to discharge certain employees were not "compelled or even influenced by any State regulation," although it found the school to be extensively regulated in general. *Rendell-Baker v. Kohn, supra,* 457 U.S. at 842, 102 S.Ct. at 2772, 73 L.Ed.2d at 428.

■ This Court has previously followed *Jackson* in *Trageser v. Libbie Rehabilitation Center, Inc.,* 462 F.Supp. 424, 426 (E.D.Va. 1977), aff'd, 590 F.2d 87 (4th Cir.1978), cert. denied, 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1979),[5] and in *Fike v. United Methodist Children's Home of Virginia, Inc.,* 547 F.Supp. 286, 294 (E.D.Va.1982), aff'd, 709 F.2d 284 (4th Cir.1983), to find that extensive State regulation of a nursing home and of a children's home, respectively, did not change decisions to fire employees into State action. Likewise, as the decision to dismiss plaintiff from defendant Rescue Squad was that of the general membership only and was not in obedience to or as a consequence of any State regulations, custom, or useage, the nexus required in *Jackson* does not exist.

b. Public Function

■ In further support of his State action argument, plaintiff asserts that de-fendant Rescue Squad performs a "public function." The telling question under this standard is not simply whether a private entity is serving a public function but whether the private entity is performing a function that is "traditionally the exclusive prerogative of the State." *Jackson v. Metropolitan Edison Co.,* 419 U.S. at 353, 95 S.Ct. at 455, *quoted in Blum v. Yaretsky,* 457 U.S. at 1012, 102 S.Ct. at 2789–90, 73 L.Ed.2d at 551; *Rendell-Baker v. Kohn,* 457 U.S. at 842, 102 S.Ct. at 2772, 73 L.Ed.2d at 428. Plaintiff argues that emergency transportation service has become a "tradition" of government only recently, but that the tradition exists is clear from the public nature of the service, its similarity to police and fire services, its funding from public sources, its extensive regulation by the State, and the existence of State statutes that authorize localities to enter service agreements with volunteer rescue squads and to cover the volunteers under the localities' workmen's compensation policies. Plaintiff is unable to find any authority to support his argument. Nor can the Court. *Jackson's* rubric has always been construed as written.

Plaintiff argues especially that State funding statutes[6] reflect the Commonwealth's traditional exclusivity in the field of emergency transportation service. This same argument failed to persuade the Supreme Court. A legislative policy to publicly fund the education of maladjusted high school students, *Rendell-Baker, supra,* at 842, 102 S.Ct. at 2772, 73 L.Ed.2d at 428, or to provide funds for the care of the needy, *Blum, supra,* 457 U.S. at 1011, 102 S.Ct. at 2789–90, 73 L.Ed.2d at 551, did not convince the Court that these services were the exclusive province of the State.

---

**5.** In *Trageser,* plaintiff alleged that defendant, a private corporation operating a nursing home, engaged in State action in terminating her employment. As noted by the Court of Appeals in its affirmance of the District Court's finding of no State action, the State inspector had told the administrator of the Center that the plaintiff's eyesight had deteriorated and asked what the Center intended to do about it. *Trageser,* 590 F.2d at 90. Thus, even where the State ap-peared to be the catalyst for a discharge decision by a private entity, the Fourth Circuit found this was not a sufficient nexus to establish State action.

**6.** Plaintiff points to State statutes that allow localities to fund local rescue squads and that provide State money to local governments for the funding of rescue squads. *See, e.g.,* Va. Code § 46.1–149 (as amended).

In view of the narrow scope given the public function test in the past, *see Fike v. United Methodist Children's Home of Virginia,* 547 F.Supp. 286, 293 (E.D.Va.1982), *aff'd,* 709 F.2d 284 (4th Cir.1983), plaintiff's argument that defendant was performing a function which was traditionally the exclusive prerogative of the State cannot stand. Rescue squads are more akin to private functions that the State may be just beginning to assume than to public functions that are traditionally governmental.

### c. Government Support

■ The final factor plaintiff relies on to establish State action is what plaintiff designates "significant government support." Plaintiff contends that the Rescue Squad's receipt of funding from the County; gasoline, water, and dispatching service from the Town; tax exemptions for its real and personal property; federal money distributed through a statutorily created private entity; and free private vehicle stickers for its employees transmutes the action of the Rescue Squad in dismissing plaintiff into that of the State.

In *Trageser,* this Court held that the receipt of federal payment through Medicare, Medicaid, and Veteran's Administration programs for services rendered by a nursing home to beneficiaries of those programs did not convert the acts of the nursing home into those of the State.[7] *Trageser v. Libbie Rehabilitation Center, Inc.,* 462 F.Supp. at 426. In *Fike v. United Methodist Children's Home of Virginia,* 547 F.Supp. 286 (E.D.Va. 1982), *aff'd,* 709 F.2d 284 (4th Cir.1983), this Court followed *Trageser* and held that State monies paid to maintain poor or maladjusted children in a children's home is compensation for services rendered and as such does not transform the vendor into the State. In *Fike,* this Court contrasted compensation for services rendered, which does not support State action, with the receipt of general funding to allocate as the private entity wishes. *Id.* at 294. Plaintiff distinguishes the present case by saying the mon-

ey received by the Rescue Squad from the County is such "general funding to allocate as it wishes" and is not in return for the provision of services as was the situation in *Fike. Id.*

Though the distinction drawn by plaintiff is valid, the Supreme Court has stated: "That programs undertaken by the state result in substantial funding of the activities of a private entity is no more persuasive than the fact of regulation of such an entity in demonstrating that the state is responsible for decisions made by the entity in the course of its business." *Blum, supra,* 457 U.S. at 1011, 102 S.Ct. at 2789, 73 L.Ed.2d at 551. In *Blum,* the State subsidized the operating and capital costs of the nursing homes. In addition to such general funding more than 90% of the patients had their medical expenses paid by the State. The above quoted holding, then, dealt with both compensatory funding, as in *Trageser* and *Fike,* and with general funding as in the instant case. Neither type of funding, held the Supreme Court, turns private action into State action. This Court cannot find that the funding and in-kind contributions make the State responsible for the discharge decision challenged by plaintiff.

Because plaintiff has failed, even taking into consideration the funding, regulation, and possible public function of defendant Rescue Squad, to establish sufficient indicia of State action to support a § 1983 action, the Court will grant summary judgment to defendants as to Counts I through V, alleging violation of 42 U.S.C. § 1983.

### II. SECTION 1985(3)

Plaintiff in Counts VI through VIII alleges that defendants conspired to deprive him of his right to equal protection of the laws by the use of invidiously discriminatory class-based animus in violation of 42 U.S.C. § 1985(3). Plaintiff alleges defendants actions showed class-based discriminatory animus against (1) people who are black, (2) people who exercise their right to free speech, and (3) people who petition the government for redress of grievances.

---

**7.** The purpose of the payments in *Trageser* was to "compensate for treatment of specified patients who are entitled to the benefits." *Tra-* *geser v. Libbie Rehabilitation Center, Inc.,* 590 F.2d 87, 88 (4th Cir.1978), *cert. denied,* 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1979).

## A. No Legally Cognizable Conspiracy

■ The Court agrees with defendants that plaintiff has failed to allege a legally cognizable conspiracy, an essential element of a claim under § 1985(3). Plaintiff alleges in his amended complaint that it was the actions of the individual defendants, in failing to take official action against Thompson and in expelling plaintiff, that constituted a conspiracy.

This Court has held that a § 1985 conspiracy cannot occur within a corporation or agency where the parties act in furtherance of their corporate responsibilities. *Fowler v. Department of Education*, 472 F.Supp. 121, 122 (E.D.Va.1978), *citing Dombrowski v. Dowling*, 459 F.2d 190, 193 (7th Cir.1972); *see Greenville Publishing Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974); *Bellamy v. Mason's Stores, Inc.*, 508 F.2d 504, 508 (4th Cir.1974) (Boreman, J., concurring); *Nelson Radio & Supply Co. v. Motorola*, 200 F.2d 911, 914 (5th Cir.1952), *cert. denied*, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953); *Becker v. Russek*, 518 F.Supp. 1040, 1045 (W.D.Va.1981), *aff'd*, 679 F.2d 876 (4th Cir.1982). Defendants' actions culminating in plaintiff being expelled from the Rescue Squad at the 12 May 1983 general membership meeting were within the scope of defendants' responsibilities to the Squad as individual members. In fact, the acts of defendants in moving, seconding, and approving plaintiff's termination were made pursuant to provisions of the Constitution and By-laws of the Rescue Squad. Plaintiff's argument thus would make *every* membership action a conspiracy merely because, by the nature of such an organization, it must meet, discuss, and vote. As the individual defendants acted within the scope of their authority as members, no conspiracy existed within the meaning of § 1985(3).

## B. State Action Requirement

■ Count VI deals with a conspiracy against black persons. No element of State action is necessary to state such a claim but, as noted, it fails for lack of a legally cognizable conspiracy. Plaintiff's claims under Counts VII and VIII allege a conspiracy to deprive plaintiff of his First Amendment rights of free speech and to petition the government for redress of grievances. These claims do require State action. *Bellamy v. Mason's Stores, Inc.*, 508 F.2d 504, 506–07 (4th Cir.1974). They must fail because of the absence of a conspiracy and, additionally, for the lack of State action found earlier in this opinion.

## C. Protected Classes

■ A final consideration under Counts VI through VIII is whether the alleged classes claimed to have been discriminated against by defendants' actions are protected by § 1985(3). Section 1985(3) protects against conspiracies to deprive persons of equal protection because of some discrete, insular, or immutable characteristic they possess such as race, national origin, or sex. *See Bellamy v. Mason's Stores, Inc.*, 368 F.Supp. 1025, 1028 (E.D.Va.1973), *aff'd*, 508 F.2d 504 (4th Cir.1974); *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). Count VI, based on race, clearly is within the ambit of § 1985(3). In the United States at least, people who exercise free speech and who petition the government for redress of their grievances are not in a class distinguishable from their fellow citizens and therefore are not within the realm of classes protected by § 1985(3). For this additional reason Counts VII and VIII fail. Accordingly, the Court grants summary judgment for defendants as to Counts VI, VII, and VIII, alleging violation of § 1985(3).

## III. SECTION 1981

■ Finally plaintiff claims in Count IX of his amended complaint that defendants violated his right to equal protection of the laws in violation of 42 U.S.C. § 1981.[8] De-

---

8. 42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and en-

force contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white

fendants contend an action under § 1981 must be founded upon some contractual right offered to whites and denied to blacks, *Runyon v. McCrary,* 427 U.S. 160, 168–71, 96 S.Ct. 2586, 2593–95, 49 L.Ed.2d 415 (1976), and that because only plaintiff's membership, rather than any contract right, was terminated, plaintiff has no cause of action under § 1981. Defendants' argument of a contractual nexus requirement ingrained in § 1981 is not wholly satisfying in light of *Tillman v. Wheaton-Haven Recreation Association, Inc.,* 410 U.S. 431, 436, 93 S.Ct. 1090, 1093, 35 L.Ed.2d 403 (1973), and *Wright v. Salisbury Club, Ltd.,* 632 F.2d 309, 313 (4th Cir.1980), where § 1981 was found applicable in the context of membership in private clubs. But in both those cases the club memberships were found to be tied to the ownership of or lease rights in real property and thus a contractual nexus did exist. In both cases the § 1981 claim was found to arise from the existence of this contractual base. No such nexus exists here.

Plaintiff, realizing the weakness of his contract claim, argues for an expansive reading of § 1981 to the end that it not be confined to deprivations of the right to contract. Specifically, plaintiff alleges his dismissal falls within the "equal benefit of all laws and proceedings for the security of persons" and the "like punishment, pains, penalties" clauses of § 1981. Plaintiff asserts that § 1981 means blacks have the same rights and shall be subject to the same penalties as white persons, and that his dismissal under the circumstances was a punishment or penalty. In support of this contention, plaintiff relies on two cases, *Jones v. City of Philadelphia,* 491 F.Supp. 284 (E.D.Pa.1980), and *Croswell v. O'Hara,* 443 F.Supp. 895 (E.D.Pa.1978), where § 1981 causes of action were found when black plaintiffs alleged racially motivated police brutality. These cases are founded upon the decision in *Mahone v. Waddle,* 564 F.2d 1018 (3d Cir.1977), *cert. denied,* 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978), in which the Third Circuit interpret-

ed the two clauses of § 1981 on which plaintiff relies. The Third Circuit contrasted the contract clause of § 1981, where private discrimination is actionable, with the equal benefits clause and the like punishment clause of § 1981, which require State action:

> The words 'full and equal benefit of all laws and proceedings for the security of persons and property' . . . suggests a concern with relations between the individual and the state, not between two individuals. The state, not the individual, is the sole source of law, and·it is only the state acting through its agents, not the private individual, which is capable of denying to blacks the full and equal benefit of the law. Thus, while private discrimination may be implicated by the contract clause of section 1981, the concept of state action is implicit in the equal benefit clause. The like punishment clause may be read in the same way.

*Id.* at 1029.

In the instant case, as explained before, there is no State action in defendants' conduct in dismissing plaintiff from membership in the Rescue Squad. Thus no amount of expansive reading can generate a § 1981 claim relating to the "full benefit" and "punishment or penalty" language.

As no contractual base exists on which an action under the contract clause of § 1981 can subsist and as no State action exists to support a claim under the equal benefits or like punishment clauses, summary judgment must also be granted for defendants on Count IX of plaintiff's complaint.

## IV. CONCLUSION

Though this unfortunate incident might best have been dealt with in the locality without recourse to a federal court, there is no gainsaying the serious implications of the conduct of the several participants on the life of the community. In a small community, particularly one with the historical-legal legacy of Prince Edward County, the

citizens and shall be subject to like punishment, pains, penalties, taxes, licenses, and

extractions of every kind, and to no other.

actions and reactions of a Rescue Squad command widespread attention. A tone is set by what is done and not done. Quite often high profile examples of right and wrong have more impact than the legal significance of such concepts as State action or contractual base or legally cognizable conspiracy. In other words, if these parties can now transcend the serious differences that arose between them and set an example of racial reconciliation, no victory in a lawsuit could equal the benefit to the community.

An appropriate judgment shall issue.

And it is so ORDERED.