13-656-cv
*Grogan v. Blooming Grove Volunteer Ambulance Corps*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

December Term, 2013

(Argued: December 12, 2013                    Decided: September 29, 2014)

Docket No. 13-656-cv
_____

LENORE B. GROGAN

*Plaintiff-Appellant*,

*-v.-*

BLOOMING GROVE VOLUNTEER AMBULANCE CORPS, CAROLE MCCANN, CHAIRMAN, BOARD OF
DIRECTORS,

*Defendants-Appellees*.[1]

_____

Before:        CABRANES, HALL, and CHIN, *Circuit Judges*.

_____

Appeal from a judgment of the United States District Court for the Southern District of
New York (Briccetti, *J.*) granting defendants' motion for summary judgment on plaintiff's
claims brought pursuant to 42 U.S.C. § 1983 because plaintiff failed to establish that the
defendants' challenged conduct constituted "state action."  Plaintiff alleges that a private
volunteer ambulance organization, contracted by a municipality to provide emergency medical
services as permitted by New York law, violated her rights under the First and Fourteenth
Amendments when it issued disciplinary charges against her and then suspended her from the
organization without a proper hearing. We agree with the district court that the defendants'
challenged conduct did not constitute state action under either theory pressed by the plaintiff on
appeal.

        AFFIRMED.

_____

_____

[1] The Clerk of the Court is requested to amend the caption accordingly.

MICHAEL H. SUSSMAN, Sussman & Watkins, Goshen, New York, *for Plaintiff-Appellant*.

REBECCA GRACE BALDWIN MANTELLO, and JOSEPH A. CATANIA, Jr., Catania, Mahon, Milligram & Rider, PLLC, Newburgh, New York, *for Defendants-Appellees*.

———————————————

HALL, *Circuit Judge*:

Lenore Grogan brought this civil rights suit pursuant to 42 U.S.C. § 1983 against the Blooming Grove Volunteer Ambulance Corps ("BGVAC") and several of its directors, alleging that various disciplinary charges levied against her by BGVAC, and her resulting suspension as an officer of BGVAC without a hearing, violated her rights under the First and Fourteenth Amendments of the United States Constitution. The United States District Court for the Southern District of New York (Briccetti, *J*.) granted summary judgment to the defendants and dismissed Grogan's federal constitutional claims after concluding that the challenged acts of BGVAC did not constitute "state action." Grogan argues on appeal that BGVAC's conduct amounts to state action because: (1) the services BGVAC provides—emergency medical care and general ambulance services—are "traditionally exclusive public functions" that the State has delegated to BGVAC; and (2) the extensive State regulation and oversight under which BGVAC operates, coupled with BGVAC's performance of a "municipally assumed" statutory function, so "entwines" BGVAC with the State that its actions are fairly attributable to the State. Because BGVAC's conduct does not constitute state action under either theory, we affirm the judgment of the district court.

2

# BACKGROUND[2]

BGVAC is a private, non-profit membership corporation organized under the laws of New York. The Town of Blooming Grove, New York contracted with BGVAC to provide emergency medical services and general ambulance services to the members of that community, as authorized by New York Town Law § 198(10-f). As relevant here, that statutory provision states that a town in New York "may . . . provide" emergency medical and general ambulance services "and to that end may . . . [c]ontract with one or more . . . organizations . . . to supply, staff and equip emergency medical service or ambulance vehicles suitable for such purposes and operate such vehicles for the furnishing of prehospital emergency treatment." N.Y. Town Law § 198(10-f)(a)(iii). Various other provisions of New York law permit "municipalities" to provide emergency medical and general ambulance services in a similar manner, *see* N.Y. Gen. Mun. Law § 122-b, provide for state oversight and regulation of emergency medical services, *see* N.Y. Pub. Health Law §§ 3000–032, and establish a benefits scheme and an award program for volunteer ambulance workers, *see* N.Y. Gen. Mun. Law §§ 219-b–219-t; N.Y. Volunteer Ambulance Workers Benefit Law §§ 1–91.

The terms of BGVAC's contract with the Town require it to maintain emergency response vehicles and to hire trained personnel for the purpose of providing emergency medical services and the transportation of sick and injured persons. In consideration for these services the Town pays BGVAC a yearly sum of $362,000, distributed in four quarterly installments. The contract identifies BGVAC as an "independent contractor" and disclaims any agency or employment relationship between the Town and BGVAC. BGVAC is also required to purchase

---

[2] The following facts are undisputed unless otherwise noted.

and maintain liability insurance "in an amount deemed satisfactory by the Town" and to indemnify the Town against "any and all cost, claim, injury, damage or liability" arising from the contract or the services BGVAC provides. The contract allows the Town to audit BGVAC's books and requires BGVAC to provide the Town with quarterly reports detailing its financial activities, but there is no indication in the record that the Town appoints BGVAC's board of directors, oversees the election of BGVAC officers, or has any role in BGVAC's personnel decisions.

Grogan is a certified emergency medical technician who became a member of BGVAC in 2001 and was elected Captain in 2007. In that capacity, Grogan was responsible for supervising the assistant captain and lieutenants, overseeing scheduling and training, reporting to BGVAC's board of directors ("Board"), and fundraising. In May 2008, the Board issued twenty-one charges against Grogan and suspended her for dereliction of her duties as Captain, violations of BGVAC's rules and regulations, and failure to follow approved medical protocol. Although the Board's letter informing Grogan of her suspension stated that she was entitled to a hearing on the charges, the hearing never took place, and Grogan was never reinstated.

Grogan, acting *pro se*, subsequently brought this § 1983 action against BGVAC and the Chair of its Board.[3] She alleged in her complaint that after she was elected Captain and attempted to implement certain changes to BGVAC procedures, the members of the Board consistently undermined her authority, verbally abused her during Board meetings, and brought numerous "fictitious charges" against her. She claimed that the Board violated her constitutional rights under the First and Fourteenth Amendments by propounding "false charges" against her in

---

[3] In a decision not challenged on appeal, the district court dismissed Grogan's claims against four other members of the Board for lack of timely service.

4

retaliation for certain actions she took as Captain and by failing to provide her with a proper hearing on the charges that led to her suspension. The district court granted the defendants' motion for summary judgment, concluding that Grogan had not established that the defendants' challenged conduct constituted "state action," an essential prerequisite to her federal constitutional claims. The only issue on appeal is whether that conclusion was correct.[4]

## DISCUSSION

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review the district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to Grogan as the nonmoving party. *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012).

"Because the United States Constitution regulates only the Government, not private parties," a litigant like Grogan who alleges that her "constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.'" *Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 396 F.3d 178, 186 (2d Cir. 2005) (additional quotation marks omitted); *see also Fabrikant*, 691 F.3d at 206 ("A plaintiff pressing a claim of violation of his constitutional rights under § 1983 is . . . required to show state action." (internal quotation marks omitted)); *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 491 (2d Cir. 2009) ("The Fourteenth Amendment, and, through it, the First Amendment, do not apply to private parties unless those parties are engaged in activity deemed to be state action." (alterations, ellipsis, and internal quotation marks

---

[4] Grogan's complaint also included a state-law defamation claim, which the district court dismissed as time-barred under the applicable statute of limitations. As Grogan does not challenge the dismissal of that claim on appeal, we deem it abandoned and do not consider it further. *See Gordon v. Softech Int'l*, 726 F.3d 42, 47 n.1 (2d Cir. 2013).

5

omitted)). The purpose of the state action requirement is, at bottom, to "preserve an area of individual freedom by limiting the reach of federal law" and avoid imposing "responsibility on a State for conduct it could not control" while, at the same time, ensuring that constitutional standards are available when it may be fairly said that the State is indeed responsible for the conduct of which the plaintiff complains. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (alteration and internal quotation marks omitted).

To demonstrate state action, a plaintiff must establish both that her "'alleged constitutional deprivation [was] caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible, *and* that the party charged with the deprivation [is] a person who may fairly be said to be a state actor.'" *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 111 (2d Cir. 2003) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999)) . The latter requirement, which is the only one we need address today, is met upon a showing that the "allegedly unconstitutional conduct is fairly attributable to the State." *Sullivan*, 526 U.S. at 50. A plaintiff complaining that the actions of a nominally private entity violated her constitutional rights makes this showing by demonstrating that "there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood Academy*, 531 U.S. at 295 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).

We begin the fair attribution inquiry by identifying "'the specific conduct of which the plaintiff complains,' rather than the general characteristics of the entity." *Fabrikant*, 691 F.3d at 207 (quoting *Sullivan*, 526 U.S. at 51). Here, Grogan alleges that BGVAC violated her constitutional rights when it issued disciplinary charges against her and indefinitely suspended

6

her without a proper hearing. Thus, the ultimate issue we must address is whether the decision of a private volunteer ambulance organization to charge and suspend one of its officers is fairly attributable to the State so as to subject the organization to the strictures of the Constitution when the organization has contracted with a municipality to provide emergency medical services, as authorized by state law. *Cf. Sullivan*, 526 U.S. at 51.

This determination "is a matter of normative judgment" that does not lend itself to bright-line rules or "rigid" criteria. *Brentwood Academy*, 531 U.S. at 295. Instead, "there are a host of factors that can bear on the fairness of an attribution of a challenged action to the State." *Fabrikant*, 691 F.3d at 207 (internal quotation marks omitted). Of the variety of tests the Supreme Court has employed over the years to determine whether the acts of a private entity are fairly attributable to the state, two are relevant to this appeal. *See Brentwood Academy*, 531 U.S. at 296 (laying out the various tests). The first, dubbed the "public function" test, holds that the required "close nexus" between the challenged action and the State "may be present if the private entity has exercised powers that are 'traditionally the exclusive prerogative of the State.'" *Blum v. Yaretsky*, 457 U.S. 991, 1005 (1982) (quoting *Jackson*, 419 U.S. at 353). Under the second, a private entity may be considered a state actor "when it is entwined with governmental policies, or when government is entwined in its management or control." *Brentwood Academy*, 531 U.S. at 296 (alterations and internal quotation marks omitted). Grogan has failed to make the required showing under either test, as we explain below.

## I. The "Public Function" Test

Under the public function test, "[s]tate action may be found in situations where an activity that traditionally has been the exclusive, or near exclusive, function of the State has been contracted out to a private entity." *Horvath v. Westport Library Ass'n*, 362 F.3d 147, 151 (2d

Cir. 2004).  This test, which also has been referred to as the "sovereign-function doctrine," *Flagg*

*Bros., Inc. v. Brooks*, 436 U.S. 149, 163 (1978), focuses not on whether the activity delegated to

the private entity has been regularly performed by governments, but instead on whether the

activity historically has been "an exclusive perogative of the sovereign," *id.* at 159.  *See also id.*

at 158 ("While many functions have been traditionally performed by governments, very few

have been exclusively reserved to the State." (internal quotation marks omitted)); *Sybalski v.*

*Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 259 (2d Cir. 2008) ("[P]rivate actors

must be delegated functions that were traditionally under the exclusive authority of the state for

the public function test to be satisfied.").  Thus, courts have found state action when private

parties perform such sovereign functions as medical care for prison inmates, *see West v. Atkins*,

487 U.S. 42, 54–57 (1988); holding local primary elections, *see Terry v. Adams*, 345 U.S. 461,

469–70 (1953); animal control, *see Fabrikant*, 691 F.3d at 207–08; operation of a post office, *see*

*Cooper*, 577 F.3d at 492–93; and, most relevant to our purposes, fire protection, *see Janusaitis v.*

*Middlebury Volunteer Fire Dep't*, 607 F.2d 17 (2d Cir. 1979).

Although Grogan would add the provision of emergency medical care and general

ambulance services to this list, it cannot be said that these services are "traditionally exclusive

public function[s]," similar to those just identified.  *Sullivan*, 526 U.S. at 55.  Indeed, as reflected

in a report prepared by the National Highway Traffic Safety Administration, which Grogan cites

in her brief, ambulance services in this country historically were provided by an array of non-

state actors, including hospitals, private ambulance services, and, in what seems to be somewhat

of a conflict of interest, funeral homes.  *See* Nat'l Highway Traffic Safety Admin., *Emergency*

*Medical Services, Agenda for the Future* 61 (2010), http://www.ems.gov/pdf/2010/

EMSAgendaWeb_7-06-10.pdf (last visited Sept. 8, 2014).   The same is true for ambulance

services in New York. For example, the legislative history of New York General Municipal Law § 122-b, which states that municipalities "may provide" emergency medical and general ambulance services, suggests that one of the driving forces behind the law was the loose amalgam of non-state actors providing those services in the absence of any authority for municipalities to do so themselves. *See, e.g.*, Letter from the Ass'n of Towns of the State of N.Y., to Hon. Thomas E. Dewey, Governor, Apr. 2, 1954, N.Y. Bill Jacket, 1954 S. Intro. 2788, 169th Leg. Reg. Sess. (1954), ch. 598, at 8–9 ("At the present time, there is no authority for a town or village to operate a general ambulance service. . . . Such services were provided in the past in many instances by undertakers in the outlying areas, or the hospitals would send their own ambulances out."). And while Grogan invokes the long history of military ambulance and emergency medical services, *see* Appellant Br. 15–17, we do not agree with her that the historic sovereign practice of providing medical care to wounded soldiers supports a conclusion that similar services to the general populace traditionally were provided exclusively by States, especially in light of the sources, cited above, indicating that they were not.

Moreover, Grogan has not referred us to any case holding that the provision of emergency services is a function traditionally associated with state sovereignty, and every decision we have located has reached the opposite conclusion. *See, e.g.*, *Groman v. Twp. of Manalapan*, 47 F.3d 628, 641 (3d Cir. 1995) ("[W]e cannot accept . . . that a volunteer first aid squad would be deemed to perform an exclusive government function merely because a volunteer fire department had been held to perform one."); *Hollman v. Cnty. of Suffolk*, No. 06-CV-3589, 2011 WL 2446428, *5–7 (E.D.N.Y. June 15, 2011) (unpublished) (holding that although ambulatory services are subject to extensive regulation by the New York State Department of Health, they are not a traditional public function); *Osler v. Huron Valley*

9

*Ambulance Inc.*, 671 F. Supp. 2d 938, 943 (E.D. Mich. 2009) ("Ambulance service does not carry with it a badge of sovereignty.  It does not amount to a power traditionally exclusively reserved to the State." (alteration and internal quotation marks omitted)); *Chasse v. Humphreys*, No. CV- 07-189-HU, 2009 WL 3334912, *6 (D. Or. Oct. 13, 2009) (unpublished) ("[P]rovision of emergency medical services is not an exclusive and traditional public function . . . ."); *Krieger v. Bethesda-Chevy Chase Rescue Squad*, 599 F. Supp. 770, 773–74 (D. Md. 1984) (holding that a rescue squad that assisted firefighters on the scene did not serve a traditionally public function), *aff'd without opinion*, 792 F.2d 139 (4th Cir. 1986); *Eggleston v. Prince Edward Volunteer Rescue Squad, Inc*., 569 F. Supp. 1344, 1351 (E.D. Va. 1983) ("Rescue squads are more akin to private functions that the State may be just beginning to assume than to public functions that are traditionally governmental."), *aff'd without opinion*, 742 F.2d 1448 (4th Cir. 1984).  Although these decisions are not binding upon us, they clearly support our general conclusion that emergency medical and ambulance services are not traditional and exclusive public functions.

Grogan also argues that even if ambulance and emergency medical services traditionally were not the exclusive prerogative of the State, New York has authorized its municipalities to provide such services and, when a municipality elects to do so, it assumes an affirmative duty to act.  There is support for the proposition that a State, by statute, may assume a public function. *See Jackson*, 419 U.S. at 352–53; *Perez v. Sugarman*, 499 F.2d 761, 765 (2d Cir. 1974).  When assessing how such a statute operates to allow a governmental entity to take over a traditionally private function, however, the focus is on whether the statute imposes upon the governmental entity the "obligation," *Jackson*, 419 U.S. at 353, or the "ultimate responsibility," *Perez*, 499 F.2d at 765, to perform the activity.  Thus, in *Jackson*, the Supreme Court found that a Pennsylvania statute that directed public utility companies to furnish adequate services

10

"impose[d] no such obligation on the State." 419 U.S. at 352–53. By contrast, in *Perez* we held that private institutions caring for neglected and abandoned children performed a public function because the New York statute authorizing the use of such institutions unequivocally declared that State officials "shall be responsible for the welfare" of the children. *See* 499 F.2d at 765 (internal quotation marks omitted).

Here, the statute authorizing the Town to contract with BGVAC, New York Town Law § 198(10-f), imposes no duty, obligation, or responsibility on New York towns to provide emergency medical services. Instead, the statute is entirely permissive, declaring that "the town board *may* . . . provide an emergency medical service, a general ambulance service, or a combination of such services . . . and to that end *may* . . . [c]ontract with one or more . . . organizations" to provide such services. N.Y. Town Law § 198(10-f)(a)(iii) (emphasis added).[5] Because the New York statutory scheme does not place an affirmative responsibility on towns or municipalities to provide ambulance services, those services cannot be considered "public functions." *See Jackson*, 419 U.S. at 352–53; *Perez*, 499 F.2d at 765; *see also Sullivan*, 526 U.S. at 55–56 (finding no state action when "nothing in Pennsylvania's Constitution or statutory scheme obligates the State to provide either medical treatment or workers' compensation benefits to injured workers"). In addition, the simple fact that the Town opted to contract with BGVAC to provide the services "does not convert [BGVAC's] conduct into state action." *Cooper*, 577 F.3d at 492; *see also Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982) ("Acts of . . . private

---

[5] The statute authorizing municipalities in New York to provide such services is similarly worded and similarly permissive. *See* N.Y. Gen. Mun. Law § 122-b ("Any county, city, town or village, acting individually or jointly, *may* provide an emergency medical service, a general ambulance service or a combination of such services . . . ." (emphasis added)).

11

contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts.").

Finally, even if we were to assume that the provision of emergency medical care and ambulance services constitutes state action under the public function theory (which we do not), that conclusion would be of no assistance to Grogan because the gravamen of her claims deals not with the performance of those ambulance services but instead with BGVAC's employment decision to charge and suspend her. *Cf. Blum*, 457 U.S. at 1011–12 (stating that, even assuming a state had a duty under the Medicaid statute to provide skilled nursing home services for Medicaid patients "it would not follow that decisions made in the day-to-day administration of a nursing home are the kind of decisions traditionally and exclusively made by the sovereign for and on behalf of the public"); *Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 527 (2d Cir. 1996) ("The fact that a municipality is responsible for providing medical attention to persons held in its custody may make an independent contractor rendering such services a state actor within the meaning of § 1983 with respect to the services so provided; but that fact does not make the contractor a state actor with respect to its employment decisions." (citations omitted)).

We recognize that our conclusions discussed above appear to be somewhat in tension with our decision in *Janusaitis v. Middlebury Volunteer Fire Department*, upon which Grogan heavily relies. In that case, we held that a volunteer fire department contracted by a Connecticut municipality under a statutory scheme similar to New York's discussed above (*i.e.* it authorized but did not mandate towns to enter into such agreements for services), performed "state action" when it discharged one of its firefighters, allegedly in violation of the First Amendment. *See Janusaitis*, 607 F.2d at 21–25. However, *Janusaitis*'s holding that fire protection constituted a public function was based on historic and statutory realities that simply are not comparable to the

12

provision of emergency medical care or ambulance services. Namely, our conclusion that fire protection was traditionally an exclusive state function was rooted in Supreme Court dicta suggesting as much. *See id.* at 21–22 (citing *Flagg Bros. Inc.*, 436 U.S. at 163–64 (stating that among the functions that "have been administered with a greater degree of exclusivity by States and municipalities" were "such functions as education, fire and police protection, and tax collection")). Supporting that view was the fact that Connecticut had statutorily vested volunteer firefighters with certain powers "traditionally associated with sovereignty," such as the authority to direct citizens to leave any building "in the vicinity of a fire on penalty of fine or imprisonment." *Id.* at 24. Grogan has not cited, and we have not discovered, any similar analog in the New York statutory scheme addressing volunteer ambulance services.[6] For these reasons, our analysis in *Janusaitis* is not controlling. We hold that Grogan has failed to demonstrate "state action" under the public function theory.

## II.      The "Entwinement" Test

Grogan fares no better under an entwinement theory of state action. Under that theory, state action may exist when a private entity "is entwined with governmental policies, or when government is entwined in its management or control." *Brentwood Academy*, 531 U.S. at 296 (alterations and internal quotation marks omitted). Grogan argues that the disciplinary charges and her suspension without a hearing amounted to state action because New York imposes a variety of regulatory requirements on volunteer ambulance and emergency services organizations

---

[6] We also note that the fire department's performance of a public function was only one of two independent reasons we gave in *Janusaitis* for subjecting the department's personnel decisions to the strictures of the First Amendment. The other sufficiently independent reason for finding state action, and one that does not obtain here, *see* Section II, *infra*, was that the town had so "insinuate[d] itself into a position of interdependence with the Department" that the actions of the Department could properly be viewed as those of the town itself. *See Janusaitis*, 607 F.2d at 23 (internal quotation marks omitted).

like BGVAC. For example, New York law provides that an ambulance service may not operate within the state unless it first obtains a certificate from the New York Department of Health. *See* N.Y. Pub. Health Law § 3005. A number of statewide and regional emergency services councils established under the Department of Health are responsible for setting the minimum standards necessary to obtain such certificates, and the Department has authority to inspect ambulance services and to suspend or revoke their certificates. *See id.* § 3002–3004-a; N.Y.C.R.R. § 800.16. Although these statutes and regulations demonstrate that New York is involved in the "creation, funding, licensing, [and] regulation" of volunteer ambulance organizations, that fact alone is insufficient to support a finding of state action with respect to the disciplinary actions that form the basis of Grogan's complaint. *See Cranley*, 318 F.3d at 112. Instead, Grogan is required to show that the State is so entwined with BGVAC's management that its personnel decisions are fairly attributable to the State. *See, e.g.*, *United States v. Int'l Bhd. of Teamsters*, 941 F.2d 1292, 1296 (2d Cir. 1991) ("The question is not whether the decision to *establish* the [private entity] was state action, but rather whether the [private entity's] decision to *sanction* [the plaintiffs] may be fairly attributable to the Government." (internal quotation marks omitted)).

Our decision in *Horvath v. Westport Library Association* is instructive on this point. *See* 362 F.3d 147, 151–54 (2d Cir. 2004). In that case, the plaintiff brought a § 1983 action against a library association in Westport, Connecticut, complaining that it violated her right to due process when it terminated her employment without affording her notice and an opportunity to be heard. *See id.* at 149, 151. In reaching our conclusion that the plaintiff's termination was state action, we found it relevant, but not dispositive, that the library association's budget was "almost exclusively composed of public funds." *Id.* at 151–52. Instead, we found the decisive factor to be the amount of control that Westport could potentially exercise over the library's "internal

14

management decisions," as shown by the town's authority to appoint one-half of the library's board of directors. *See id.* at 152–54 (citing *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 400 (1999) (corporation considered a state actor when "the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation")). Westport's control over half of the library's board, coupled with the public funding the library received, was evidence of such "pervasive entwinement" between the town and the library that the library's management decisions could be considered state action. *See id.* at 154.

Here, while we may safely presume that BGVAC derives the vast majority of its funding from public sources given its $362,000 yearly contract with the Town and the contractual provision permitting the Town to audit BGVAC's finances, Grogan has introduced no evidence suggesting that the Town appoints any portion of BGVAC's Board or has any say in BGVAC's management or personnel decisions. Nor has she presented any evidence to suggest that the Town played any role in the disciplinary process that resulted in her suspension. BGVAC's contract with the Town, moreover, identifies it as an "independent contractor" and expressly disclaims any employment or agency relationship between BGVAC and the Town. *See* Joint App'x at 317–18. On these undisputed facts, we conclude as a matter of law that the Town is not sufficiently entwined with BGVAC's management as to render Grogan's suspension without a hearing "state action."

## CONCLUSION

Because Grogan has failed to demonstrate a sufficiently close nexus between the State or Town governmental entities and the disciplinary actions taken against her, BGVAC's actions

15

cannot be fairly attributed to the State or the Town and, as a result, BGVAC cannot be held liable under § 1983.  The judgment of the District Court is **AFFIRMED**.