SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**State v. Brandon T. Morrison (A-36-15) (076379)**

**Argued September 27, 2016 -- Decided December 14, 2016**

**Albin, J., writing for a unanimous Court.**

In this appeal, the Court considers whether a volunteer emergency medical technician (EMT), working for a private, non-profit rescue squad that receives municipal funding to provide service in a township, is a "public servant" under the official-misconduct statute, N.J.S.A. 2C:30-2(a).

In 2011, the Pemberton Rescue Squad was a private, non-profit organization that contracted with Pemberton Township to provide back-up emergency ambulance services for that municipality. Defendant Brandon Morrison served as a volunteer EMT on the Squad and as the Squad's treasurer. The Lourdes Health System supplied primary and secondary emergency medical services for the Township. As treasurer, Morrison maintained the Squad's checkbook but did not have authority to expend funds without the Squad's approval.

At a Squad meeting in October 2011, the treasurer's report revealed that the Squad's checking account had a significant and unexplained shortage. When challenged, Morrison admitted to making unauthorized purchases, but claimed he did so for the benefit of the Squad. Morrison was suspended from his duties, and an investigation revealed that he had fraudulently signed forty-two checks for expenditures totaling $20,429.79. Some of the checks reflected potentially legitimate purchases, but an audit conducted by the Burlington County Prosecutor's Office revealed that Morrison made purchases using Squad funds in the amount of $5,345.82 that had no justifiable basis.

Morrison was indicted on charges of third-degree theft by deception, third-degree theft by computer, third-degree wrongful impersonation, third-degree misapplication of entrusted property, and second-degree official misconduct. The trial court granted Morrison's motion to dismiss the official-misconduct charge, holding that a volunteer EMT, who is part of a private first-aid squad that has contracted to provide services in a municipality, is not a "public servant" under N.J.S.A. 2C:30-2(a).

The Appellate Division granted the State's motion for leave to appeal, and a divided three-member panel affirmed the judgment of the trial court in a per curiam opinion. The majority held that the Pemberton Rescue Squad was not exercising a governmental function sufficient "to make it the equivalent of the government in the Township." The majority suggested, however, that a volunteer rescue squad that is the sole or predominant provider of emergency medical services in a municipality may be performing a sufficiently exclusive governmental function to make its members public servants under the official-misconduct statute. The dissenting panelist expressed the view that, because Morrison performed a governmental function, he could be charged with official misconduct.

The Court granted the State's motion for leave to appeal. 223 N.J. 553 (2015).

**HELD**: A municipality's contracting for emergency medical services through a private, non-profit first-aid squad does not convert the EMTs into public servants because they are not exercising authority of a uniquely governmental nature or performing a function exclusive to government in any traditional sense, regardless of whether there are one or more non-profit providers of publically funded emergency medical services for the municipality. Morrison did not commit the offense of official misconduct because he was not performing a governmental function and therefore was not a public servant. The Court affirms the judgment of the Appellate Division and remands for proceedings on the four remaining counts.

1. The primary task in this appeal is to discern the meaning of "public servant," N.J.S.A. 2C:27-1(g), in the context of the official-misconduct statute, N.J.S.A. 2C:30-2(a). The Court reviews this question de novo, applying traditional principles of statutory construction. (pp. 14-15)

2. The official-misconduct statute applies to "public servant[s]," N.J.S.A. 2C:30-2, and aims "to prevent the perversion of governmental authority," State v. Perez, 185 N.J. 204, 206 (2005). A public servant is subject to enhanced penalties for an offense related to his official duties because those in whom a public trust is reposed are held to a higher standard than ordinary citizens. Only "public servants" -- and their accomplices or co-conspirators -- can be convicted of official misconduct. (pp. 15-16)

3. "'Public servant' means any officer or employee of government, including legislators and judges, and any person participating as juror, advisor, consultant or otherwise, in performing a governmental function, but the term does not include witnesses[.]" N.J.S.A. 2C:27-1(g). The language "any person participating . . . otherwise, in performing a government function" is not clear. The Court has previously held that when the State or a public entity contractually delegates to a person in the private sector the authority to enforce a State regulatory or licensing scheme and to act as the alter ego of the government, that person is performing the duties of a public servant. Perez, supra, 185 N.J. at 207. (pp. 16-18)

4. The Court cites cases in which defendants were found to act as the alter ego of the government, such as the head clerk of a privatized DMV who performed a governmental function in issuing State-authorized documents, as well as the S.P.C.A. agent vested with the power to enforce all laws for the protection of animals. In contrast, ordinary government contracts with a private entity do not convert the entity's employees into public servants. (pp. 18-21)

5. In the present case, the government contracted with a non-profit entity to perform services or functions that are provided in both the public and private sectors. A uniquely governmental service or function, almost by definition, cannot be one where the private sector has traditionally occupied a substantial part of the field. Private educational contractors, for example, are not public officials. (pp. 21-23)

6. To the extent that the definition of public servant is capable of both a broad and narrow construction, the Court must apply the narrow one in interpreting a criminal statute. Further, due process requires that citizens be given adequate notice of what the law proscribes. The Court's conclusion that a function or service performed equally by the private sector and the government is neither the exercise of uniquely governmental authority nor one exclusive to government in any traditional sense keeps within reasonable and constitutional bounds the scope of the official-misconduct statute. (p. 24)

7. Although only of persuasive authority, it is noteworthy that EMTs, such as defendant, are not considered state actors for purposes of a civil-rights action under 42 U.S.C. § 1983 because emergency medical services carried out through a voluntary rescue or ambulance squad are not deemed a "public function." (pp. 24-26)

8. From a historical perspective, first-aid squad services have not been a traditional governmental function, much less an exclusive one, in contrast to firefighting services. The Court declines to find that Morrison was a "public servant" merely because volunteer EMTs are subject to state regulations and receive certain legislative benefits and tort immunities that encourage citizens to undertake life-saving activities on behalf of the public. The Court notes that hospital workers are subject to similar statutory regulations, yet no one would reasonably suggest that hospital employees are public servants subject to the official-misconduct statute. (pp. 26-28)

9. The Court disagrees with the Appellate Division majority's suggestion that "a volunteer first aid and rescue squad that contracts with a municipality to be the sole or predominant provider of [emergency medical] services" in that municipality may perform a sufficiently exclusive governmental function to transform its EMTs into public servants. The happenstance of whether there are one or more non-profit providers of publically funded emergency medical services in a municipality does not alter the equation that the EMTs are not exercising a uniquely governmental authority or performing a function exclusive to government in any traditional sense. (p. 28)

10. Morrison did not commit the offense of official misconduct because he was not performing a governmental function and therefore was not a public servant. (pp. 28-29)

The judgment of the Appellate Division is **AFFIRMED**. The matter is **REMANDED** to the trial court for proceedings on the four remaining counts of the indictment.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE ALBIN's opinion.**

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

       v.

BRANDON T. MORRISON,

    Defendant-Respondent.

Argued September 27, 2016 – Decided December 14, 2016

On appeal from the Superior Court, Appellate Division.

Bethany L. Deal, Assistant Prosecutor, argued the cause for appellant (Robert D. Bernardi, Burlington County Prosecutor, attorney).

Brenda R. Maneri argued the cause for respondent (Sitzler & Sitzler, attorneys).

Carol M. Henderson, Assistant Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Christopher S. Perrino, Attorney General, attorney).

JUSTICE ALBIN delivered the opinion of the Court.

In this appeal, we must determine whether a volunteer emergency medical technician (EMT), working for a private, non-profit rescue squad that receives municipal funding to provide service in a township, is a "public servant" under the official-misconduct statute, N.J.S.A. 2C:30-2(a).

1

Pemberton Township contracted with the Pemberton First Aid and Rescue Squad (Pemberton Rescue Squad) -- a private, non-profit organization -- to provide back-up emergency medical services for the municipality. Defendant Brandon Morrison served as a volunteer EMT on the Pemberton Rescue Squad and as the Squad's treasurer. Defendant was charged with official misconduct and other crimes for misappropriating the Squad's funds.

The trial court found that defendant did not meet the statutory definition of public servant, N.J.S.A. 2C:27-1(g), an essential element of official misconduct, because he was not performing a governmental function as a volunteer EMT. The trial court dismissed the official-misconduct charge, and a panel of the Appellate Division affirmed in a split decision.

We now hold that a volunteer EMT, who works for a private, non-profit first-aid squad that provides contractual services to a municipality, is not performing a governmental function within the meaning of N.J.S.A. 2C:27-1(g), and therefore is not a public servant for purposes of the official-misconduct statute, N.J.S.A. 2C:30-2(a). We come to that conclusion because a private first-aid squad neither performs a service exclusively provided by the government in any traditional sense nor exercises authority of a uniquely governmental nature and because a first-aid squad's contract to provide services to a

2

governmental entity does not transform its employees into public servants.

Accordingly, we affirm the judgment of the Appellate Division dismissing the official-misconduct charge and remand for proceedings on the remaining criminal charges against defendant.

I.

A.

A Burlington County grand jury indicted defendant Brandon Morrison on charges of third-degree theft by deception, N.J.S.A. 2C:20-4(a)-(c); third-degree theft by computer, N.J.S.A. 2C:20-25(c); third-degree wrongful impersonation, N.J.S.A. 2C:21-17(a)(1), (4); third-degree misapplication of entrusted property, N.J.S.A. 2C:21-15; and second-degree official misconduct, N.J.S.A. 2C:30-2(a).

The Honorable James W. Palmer, Jr., J.S.C., granted defendant's motion to dismiss the official-misconduct charge after a review of the grand-jury hearing and other relevant exhibits. The record before us is primarily derived from the grand-jury testimony that led to the return of the official-misconduct charge.

In October 2011, defendant served as a volunteer EMT with the Pemberton Rescue Squad, which had roughly ten members. Defendant also held volunteer and paid EMT positions in other

3

locales. The Pemberton Rescue Squad was a private, non-profit organization that contracted with Pemberton Township to provide back-up emergency ambulance services for that municipality. Primary and secondary emergency medical services for the Township were supplied through the Lourdes Health System, which operated two ambulances, one in service twenty-four hours a day, seven days a week, and the other Monday through Friday from 6:00 a.m. to 6:00 p.m.

The Pemberton Rescue Squad was financed through a $25,000 contract with the Township, fundraisers, and any available federal monies. The Squad's bylaws empowered its chief to expend not more than $200 a month for Squad-related purposes; expenditures exceeding that amount required approval of the entire membership. From 2010 until October 2011, defendant served as the Squad's treasurer and, in that role, maintained the Squad's checkbook. As treasurer, defendant did not have authority to expend funds without the Squad's approval.

At a Squad meeting in October 2011, the treasurer's report revealed that the Squad's checking account had a significant and unexplained shortage. When challenged, defendant admitted to making unauthorized purchases, but claimed he did so for the benefit of the Squad. Defendant was suspended from his duties.

An investigation revealed that defendant had forged the chief's name on forty-two checks that accounted for expenditures

4

totaling $20,429.79. Some of the checks reflected potentially legitimate purchases, such as payment for the Squad's electric bills. However, many acquisitions bore little or no relationship to the Squad's activities and were kept at defendant's residence or in his car. The questionable purchases included firefighter gear and police-related equipment, such as several pairs of handcuffs, a flashing dashboard light, an expandable baton, a plastic training gun, two portable radios, a black tactical vest, and a police shield inscribed with the words "joint terrorism task force." With the Squad's funds, defendant equipped his car with emergency lights and sirens. He also bought a laptop and defibrillator that he stored at home. An audit conducted by the Burlington County Prosecutor's Office revealed that defendant made purchases using Squad funds in the amount of $5,345.82 that had no justifiable basis.

B.

In dismissing the official-misconduct charge, Judge Palmer held that a volunteer EMT, who is part of a private first-aid squad that has contracted to provide services in a municipality, is not a "public servant" under N.J.S.A. 2C:30-2(a). A critical factor in Judge Palmer's decision was that Pemberton Township did not outsource to the volunteer, non-profit Pemberton Rescue Squad a service that was exclusively provided by the government. He relied on the rationale in State v. Mason, 355 N.J. Super.

5

296, 300-02 (App. Div. 2002), which held that, because government is not the exclusive provider of education, the officers of a private, non-profit corporation educating students at public expense were not public servants subject to the official-misconduct statute. Likewise, Judge Palmer pointed out that the Pemberton Rescue Squad performed a public service similar to those provided by hospitals. Further, he reasoned that merely because the Squad was operating pursuant to a government contract did not mean the Squad members were performing a governmental function transforming them into public servants. Judge Palmer found additional support from federal case law in which private rescue squads were not considered state actors for constitutional-tort purposes, citing Eggleston v. Prince Edward Volunteer Rescue Squad, Inc., 569 F. Supp. 1344 (E.D. Va. 1983), aff'd without opinion, 742 F.2d 1448 (4th Cir. 1984), and Krieger v. Bethesda-Chevy Chase Rescue Squad, 599 F. Supp. 770 (D. Md. 1984), aff'd without opinion, 792 F.2d 139 (4th Cir. 1986).

C.

The Appellate Division granted the State's motion for leave to appeal. In a per curiam opinion, a divided three-member panel affirmed the trial court's determination that defendant "was not a 'public servant' as defined by N.J.S.A. 2C:27-1(g)." The Appellate Division majority posited two questions: whether

6

providing "first aid and rescue services [has] become a function performed by the government" and whether the services rendered by the Pemberton Rescue Squad were "sufficiently 'exclusive' in Pemberton Township to render the Squad the equivalent of 'the government' in the Township."

The Appellate Division majority acknowledged that emergency medical services are provided by some public entities and by numerous public fire, police, and sheriff's departments. The majority also acknowledged that volunteer members of private first-aid and rescue squads are conferred legislative privileges and benefits, such as tort immunity, workers compensation and public survivor benefits, and public college assistance, and that they exercise some public authority, such as the right to mount emergency warning lights on their vehicles and to change the normal operation of traffic lights.

Although conceding that "governments may not have traditionally provided [emergency medical services]," the Appellate Division majority found noteworthy that, "over the last several decades," the Legislature and municipalities have become involved in "funding, training, regulating, and directly and indirectly providing [emergency medical services]." Despite its conclusion that there is substantial support that "first aid and rescue services can be a function performed by the government," the majority declined to answer whether those

7

services, generally, have become a governmental function. Instead, the majority determined that defendant, as a member of the Pemberton Rescue Squad, was not performing a governmental function in the circumstances of this case.

Relying on State v. Perez, 185 N.J. 204, 207 (2005), the Appellate Division majority held that the Pemberton Rescue Squad was not exercising a governmental function sufficient "to make it the equivalent of the government in the Township." In making that determination, the majority emphasized that the Pemberton Rescue Squad was providing back-up services to another private, non-profit entity -- Lourdes EMS (emergency medical services), a part of the Lourdes Health System, which contracted with Pemberton Township to deliver full-time ambulatory first-aid coverage. The majority considered it striking that the Township did not claim "that Lourdes EMS [was] also performing a governmental function or that its employees [were] 'public servants' under N.J.S.A. 2C:27-1(g)." The majority stressed that in Perez, this Court distinguished the head clerk of a private entity that had contracted to serve as a State Division of Motor Vehicles agent, who was deemed a public servant under the official-misconduct statute, from officers of a private, non-profit educational institution receiving public funds, who were not deemed public servants, citing Mason, supra, 355 N.J. Super. at 302. In comparing educational services to emergency

8

medical services, both of which are provided by public and private entities, the majority referenced language in Perez, supra, 185 N.J. at 207, that "the provision of education is not exclusive to government" to make the point that the provision of emergency medical services is similarly not sufficiently exclusive to government.

The Appellate Division majority nonetheless suggested that "a volunteer first aid and rescue squad that contracts with a municipality to be the sole or predominant provider of [emergency medical] services, or the sole or predominant supplement to publicly-provided [emergency medical] services" may be performing a sufficiently exclusive governmental function to make its members public servants under the official-misconduct statute.

The dissenting judge disagreed with the majority's determination that, because the First Aid Squad was not the exclusive provider of emergency medical services for the Township, defendant was not a public servant. The dissent posited that the majority had overstated the import of the "exclusivity" language in Perez, supra, 185 N.J. at 207. The dissent asserted that N.J.S.A. 2C:27-1(g), in defining public servant, mentions only a "'governmental function' test and makes not the slightest suggestion of an additional exclusivity requirement." The appropriate test, according to the dissent,

9

was "whether defendant's responsibilities as Squad treasurer were a 'governmental function.'" Given the nature of the authority conferred on defendant as the Squad's treasurer to use Township's funds for the purchase of equipment benefitting the public's health, safety, and welfare, and given his abuse of that authority by misappropriating those funds, the dissent "conclude[d] that defendant is a 'public servant' whom our Legislature intended to be held criminally liable for official misconduct."

We granted the State's motion for leave to appeal. State v. Morrison, 223 N.J. 553 (2015). We also granted the motion of the Office of the Attorney General to participate as amicus curiae.

## II.

### A.

The State argues that the Appellate Division majority erred by finding that the Pemberton Rescue Squad was not performing services that were "sufficiently exclusive" to those provided by the government and then concluding that defendant, who served as a volunteer EMT and the Squad's treasurer, was not a public servant under the official-misconduct statute. Echoing the dissent, the State maintains that the majority's "exclusivity" requirement is not a part of the official-misconduct statute and that the statute only requires a showing that defendant

10

performed a governmental function.  The State asserts that because volunteer firefighters are public servants for purposes of the official-misconduct statute, citing State v. Quezada, 402 N.J. Super. 277, 284 (App. Div. 2008), volunteer EMTs should be treated similarly.  In support of its argument that defendant performed a governmental function, the State points to the comparable legislative benefits, privileges, and authority conferred on both volunteer firefighters and volunteer EMTs; to the similar roles such volunteers play in protecting the health, welfare, and safety of the public; and to the fact that the Pemberton Rescue Squad was primarily funded with public monies. The State also stresses that, in its view, the Legislature intended the official-misconduct statute to be construed broadly.  Last, the State contends that the Appellate Division majority's test, which suggests that a rescue squad that is the exclusive (only) provider of emergency medical services in a township may be performing a governmental function, will lead to absurd results.

B.

Amicus the Attorney General submits that a totality-of-the-circumstances standard should guide whether a person is "performing a governmental function" under the official-misconduct statute.  Under that standard, the exclusivity of the services provided would be one of a number of factors to be

11

considered.  Other factors would include whether the person or organization:  (1) performs a traditional governmental function, or a governmental regulatory, enforcement, or service function; (2) provides a public health, safety, or welfare service; (3) is protected from civil liability, conferred statutory benefits, or supported by government funds; or (4) provides services pursuant to contract.  According to the Attorney General, an evaluation of all those factors leads to the conclusion that the Pemberton Rescue Squad was performing a governmental function and therefore defendant was accountable for official misconduct.

The Attorney General also contends that the terms "public servant" and "governmental function" are not ambiguous and therefore this Court should not turn to the doctrine of lenity as an interpretative canon to limit the scope of the official-misconduct statute.

C.

Defendant asks this Court to affirm the Appellate Division majority and find that a volunteer EMT, working for a privately incorporated first-aid and rescue squad that contractually provides services to a municipality, is not a public servant.[1]  Like the majority, defendant compares the services he performed

---

[1] In his brief, defendant notes that he was just seventeen-years old when he joined the Pemberton Rescue Squad and twenty-years old when he became its treasurer.

12

as an EMT to those rendered by the officers of a private, non-profit educational institution providing services to students at public expense, citing Mason.  In both instances, the government is not the exclusive provider of education or emergency medical services.  He reasons that he cannot be characterized as a public servant any more than the private educational officers in Mason.  Defendant further submits that the concept of "exclusivity" as a guiding standard was advanced in Perez, where this Court held that a private entity carrying out the duties of a motor vehicle agency was performing a governmental function because the private agency was "in essence, 'the government' for such purposes in the [] region."

Defendant, moreover, distinguishes Quezada, contending that rescue squads, unlike firefighting companies, are routinely owned and operated by private entities.  Last, defendant submits that any ambiguity in the official-misconduct statute must be resolved in his favor because criminal statutes must give fair notice to ordinary people of what the law proscribes.

## III.

Defendant is charged with official misconduct for allegedly misappropriating funds from the Pemberton Rescue Squad.  The issue before us is whether defendant, a volunteer EMT, who held the position of treasurer with the Squad -- a private, non-profit organization that contracted to provide back-up emergency

13

medical services for Pemberton Township -- was a "public servant," N.J.S.A. 2C:27-1(g), for purposes of the official-misconduct statute, N.J.S.A. 2C:30-2(a).

Our primary task is one of statutory interpretation -- to discern the meaning of "public servant," N.J.S.A. 2C:27-1(g), in the context of the official-misconduct statute, N.J.S.A. 2C:30-2(a). We construe a statute de novo -- "with 'fresh eyes'" -- owing no deference to the interpretive conclusions reached by either the trial court or Appellate Division, unless persuaded by their reasoning. State v. Goodwin, 224 N.J. 102, 110 (2016) (quoting Fair Share Hous. Ctr., Inc. v. N.J. State League of Municipalities, 207 N.J. 489, 493 n.1 (2011)).

"The goal of all statutory interpretation 'is to give effect to the intent of the Legislature.'" Maeker v. Ross, 219 N.J. 565, 575 (2014) (quoting Aronberg v. Tolbert, 207 N.J. 587, 597 (2011)). In doing so, "we must construe the statute sensibly and consistent with the objectives that the Legislature sought to achieve." Nicholas v. Mynster, 213 N.J. 463, 480 (2013). We will not adopt an interpretation of the statutory language that leads to an absurd result or one that is distinctly at odds with the public-policy objectives of a statutory scheme. Murray v. Plainfield Rescue Squad, 210 N.J. 581, 592 (2012).

14

With those principles in mind, we turn first to the words of the statutes at issue.

IV.

Official misconduct is defined in N.J.S.A. 2C:30-2. The statute, in pertinent part, provides:

> A public servant is guilty of official misconduct when, with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit:
>
> > a. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized or he is committing such act in an unauthorized manner[.]
>
> [N.J.S.A. 2C:30-2(a).]

Official misconduct is a crime of the second degree if the defendant unlawfully receives or deprives another of something of value in an amount greater than $200.00. N.J.S.A. 2C:30-2.

The purpose of the statute "is to prevent the perversion of governmental authority." Perez, supra, 185 N.J. at 206. A public servant is subject to enhanced penalties for an offense related to his official duties because those in whom a public trust is reposed are held to a higher standard than ordinary citizens. For example, ordinarily, a theft greater than $200 but less than $500 is punishable as a fourth-degree crime, N.J.S.A. 2C:20-2(b)(3), and a theft greater than $500 but less than $75,000 is punishable as a third-degree crime, N.J.S.A.

15

2C:20-2(b)(2)(a).  But a public servant committing such offenses is subject to greatly enhanced penalties.  A government employee who, in the course of his official duties, commits a fourth- or third-degree theft is guilty of a second-degree crime, N.J.S.A. 2C:30-2, and is subject to a ten-year sentence with a mandatory five-year parole disqualifier, N.J.S.A. 2C:43-6.5(a).

Only "public servants" -- and their accomplices or co-conspirators -- can be convicted of official misconduct. N.J.S.A. 2C:30-2.  See generally Perez, supra, 185 N.J. 204. Under the official-misconduct statute, "'[p]ublic servant' means any officer or employee of government, including legislators and judges, and any person participating as juror, advisor, consultant or otherwise, in performing a governmental function, but the term does not include witnesses."  N.J.S.A. 2C:27-1(g). The definition of "public servant" has remained unchanged since the adoption of the New Jersey Code of Criminal Justice in 1979, L. 1978, c. 95, and the text comes virtually verbatim from the Model Penal Code proposed by the American Law Institute, Model Penal Code § 240.0(7) (Am. Law Inst., Proposed Official Draft 1962).  The statute is broad in its sweep but not without limitation.

Officers and employees of government "performing a governmental function" are clearly acting as public servants. See N.J.S.A. 2C:27-1(g).  However, the language "any person

16

participating . . . otherwise, in performing a governmental function" is much less clear. See ibid. The statute does not define the phrase "performing a governmental function," and the legislative history of N.J.S.A. 2C:27-1(g) does not provide insight into the drafters' conception of that phrase. See L. 1978, c. 95. We can discern, however, certain governing principles from our jurisprudence to better understand the meaning of "public servant" in the context of the official-misconduct statute.

We have held that when the State or a public entity contractually delegates to a person in the private sector the authority to enforce a State regulatory or licensing scheme and to act as the alter ego of the government, that person is performing the duties of a public servant. Perez, supra, 185 N.J. at 207. In other words, in exercising a "uniquely governmental authority," that person is performing a governmental function within the intendment of N.J.S.A. 2C:27-1(g). Ibid.

In Perez, the head clerk of the privatized North Bergen Department of Motor Vehicles (DMV) office, which was operated by a corporate entity pursuant to a state contract, met the definition of "public servant" under the official-misconduct statute. See id. at 205-08. At that time, "the North Bergen DMV was one of numerous local motor vehicle agencies that had

17

been privatized" during the administration of Governor Christine Todd Whitman. Id. at 205. The North Bergen DMV "was authorized to issue motor vehicle licenses and vehicle registrations in the name of the State of New Jersey." Ibid. The head clerk of the privatized North Bergen DMV was charged in a criminal scheme that involved the issuance of fraudulent motor vehicle documents.[2] Ibid.

The privatized North Bergen DMV, to which State governmental licensing and registration functions had been delegated, "was, in essence, 'the government' for such purposes." Id. at 207. In determining that the North Bergen DMV's head clerk performed a governmental function, we stressed that she was responsible "for the review of applications for, and issuance of, State-authorized motor vehicle licenses, registrations, certificates of title, and forms of identification." Ibid. Thus, we emphasized that the head clerk of the privatized North Bergen DMV engaged in the "perversion of [a] uniquely governmental authority." Ibid. (emphasis added).

Another example of a defendant acting as the alter ego of the government is evident in State v. Vickery, 275 N.J. Super.

---

[2] The appeal to our Court came from defendant Luis Perez, who was charged as an accomplice and a co-conspirator to the head clerk on the official-misconduct charge and who claimed that the head clerk was not a "'public servant' within the meaning of N.J.S.A. 2C:30-2." Perez, supra, 185 N.J. at 205.

18

648 (Law Div. 1994).  There, the Law Division held that an agent of the Society for the Prevention of Cruelty to Animals (S.P.C.A.) -- a corporation "formally acknowledged and established by statute" and given the power to enforce all laws for the protection of animals -- was a public servant for purposes of the official-misconduct statute.  Id. at 651-52.  An agent of the S.P.C.A. is conferred statutory authority to apply for warrants and make arrests on behalf of the State, to carry a weapon in the performance of his duties, and to wear an exclusive badge identifying his authority -- "the mark of a public servant."  Id. at 652-53.  Because an agent of the S.P.C.A. performs a uniquely governmental function, he is accountable as a public servant under the official-misconduct statute.[3]  See id. at 655-56.

Unlike the scenarios in Perez and Vickery, our jurisprudence makes clear that ordinary government contracts with a private entity do not convert the entity's employees into public servants.  No one would reasonably suggest that a private construction company's road-crew workers paving a public highway are public servants subject to the official-misconduct statute merely because the project is government funded.  Cf. State v.

---

[3] In 2006, provisions of the S.P.C.A. statute, N.J.S.A. 4:22-1 to -11, were repealed and replaced by N.J.S.A. 4:22-11.1 to -11.12. The new statutory provisions confer on S.P.C.A. agents the same enforcement powers as the old ones.  L. 2005, c. 372, § 22.

19

<u>Williams</u>, 189 <u>N.J. Super.</u> 61, 67 (App. Div.) (concluding that mere receipt of public funds did not render defendant public servant), <u>certif. denied</u>, 94 <u>N.J.</u> 543 (1983).

For example, the Appellate Division in <u>Williams</u> found that government funding of a charitable non-profit corporation, whose purpose was to aid the poor, did not transform its defendant executive director into a public servant for purposes of the official-misconduct statute.[4] <u>Id.</u> at 63. In that case, the defendant contractually secured federal funds in an amount exceeding $160,000 for a one-year pilot nutrition program that allowed the hiring of fifteen full-time employees. <u>Ibid.</u> The defendant was convicted of official misconduct and other criminal offenses because, in part, he submitted false time sheets for his employees, who were paid government monies under false pretenses. <u>Id.</u> at 62, 64.

The <u>Williams</u> court concluded that "the mere receipt of public funds" did not make the defendant a public officer. <u>Id.</u> at 65. It reached that conclusion because a contractual agreement between the government and third parties does not, by itself, create an office and because the defendant had not been delegated "a place in our governmental system to which the continuous performance of permanent public duties has been

---

[4] The defendant was charged under <u>N.J.S.A.</u> 2A:85-1, a predecessor to our present official-misconduct statute, <u>N.J.S.A.</u> 2C:30-2(a).

20

assigned." Id. at 66. The defendant in Williams was performing a charitable function with public monies; he was not enforcing a regulatory or licensing scheme or otherwise carrying out a uniquely governmental function.

The present case falls into another category -- one in which the government contracts with a non-profit entity to perform services or functions that are provided in both the public and private sectors. On its face, it would appear that services and functions performed in both the public and private sectors are not uniquely governmental in nature -- the standard we employed in Perez to circumscribe the scope of criminalizing non-government actors as "public servants." In Perez, supra, we emphasized that the privatized motor vehicle agency was, in effect, the alter ego of government. 185 N.J. at 207.

The area in which government may operate is seemingly boundless. A uniquely governmental service or function, almost by definition, cannot be one where the private sector has traditionally occupied a substantial part of the field.

That is the point made in State v. Mason, 355 N.J. Super. 296, 302-05 (App. Div. 2002), a case that we cited with approval in Perez. Mason involved a non-profit corporation, Archway Programs, Inc., whose education division serviced disabled students placed by local school districts. Id. at 299. The tuition paid by the school districts comprised much, but not

21

all, of the funding for Archway's educational programs.  Ibid.
Two of Archway's corporate officers were indicted on charges of
official misconduct related to fraud and mismanagement of
Archway's finances.  Id. at 300.  In affirming the trial court's
dismissal of the official-misconduct charges, the Appellate
Division drew a distinction between those private contractors
who perform a regulatory function in the name of the State and
those who do not.  Id. at 303-04.  Writing for the appellate
panel, Judge (later Justice) Hoens observed that, historically,
public and private institutions have occupied the field of
education.  Id. at 304.  Judge Hoens reasoned that "the
fundamental nature of the undertaking" -- the education of
children -- is not changed when a private institution receives
funding through a public contract and that the contract does not
transform a private contractor into a public official.  Id. at
304-05.

Importantly, in Perez, supra, we distinguished between the
private contractor operating the North Bergen DMV in that case
and the private educational contractor in Mason.  185 N.J. at
207.  We observed that, whereas in Perez, the issuance of motor
vehicle licenses and registrations was the exercise of a
"uniquely governmental authority," the provision of education in
Mason was "not exclusive to government."  Ibid. (emphasis
added).  Perez set forth practical limiting principles to ensure

22

that the official-misconduct statute was not set loose from its legislative moorings and did not offend notions of due process. Nothing about the official-misconduct statute suggests that the Legislature intended to transform employees of a private contractor with a typical government contract into public servants.

To the extent that the definition of public servant is capable of both a broad and narrow construction, we are constrained to apply the narrow one in interpreting a criminal statute. State v. Shelley, 205 N.J. 320, 328 (2011) ("[W]e must strictly construe the language of [a penal statute] where there is some uncertainty as to its application."); see also State v. Vasquez, 129 N.J. 189, 200 (1992). Vague laws are anathema to our Constitution because due process requires that citizens be given adequate notice of what the law proscribes and because persons of average intelligence should not have to guess about the meaning of a penal statute. Cf. State v. Mortimer, 135 N.J. 517, 532 (1994), cert. denied, 513 U.S. 970, 115 S. Ct. 440, 130 L. Ed. 2d 351 (1994).

When the private sector and the government are engaged in performing the same function or providing the same service, then the private sector is not exercising authority of a uniquely governmental nature or one exclusive to government in any traditional sense. That conclusion keeps within reasonable and

23

constitutional bounds the scope of the official-misconduct statute.

V.

Although only of persuasive authority, it is noteworthy that EMTs, such as defendant, are not considered state actors for purposes of a civil-rights action under 42 U.S.C. § 1983 because emergency medical services carried out through a voluntary rescue or ambulance squad are not deemed a "public function."  Federal courts have held that a private entity exercises a "public function" when it exercises "powers traditionally [or] exclusively reserved to the State."  Jackson v. Metro. Edison Co., 419 U.S. 345, 352, 95 S. Ct. 449, 454, 42 L. Ed. 2d 477, 485 (1974) (emphasis added).

In Groman v. Township of Manalapan, the United States Court of Appeals for the Third Circuit concluded that a volunteer first-aid squad that received $25,000, or more, in public funds annually to provide coverage in a municipality was not acting under color of state law for § 1983 purposes, even when responding to a police dispatch.  47 F.3d 628, 638-42 (3d Cir. 1995).  The Third Circuit noted "that receipt of public funds and the performance of a function serving the public alone are not enough to make a private entity a state actor" and that the first-aid squad in that case was not performing an "exclusive government function."  Id. at 640.  The Third Circuit rejected

24

the argument that, because a volunteer fire department has been held to perform an exclusive government function, it logically follows that a volunteer first-aid squad does so as well. Id. at 640-41.

Similarly, in Eggleston, supra, the United States District Court for the Eastern District of Virginia held that rescue squads did not perform a "public function," reasoning that they "are more akin to private functions that the State may be just beginning to assume than to public functions that are traditionally governmental." 569 F. Supp. at 1351.[5]

We now apply the principles discussed above to the facts of the case before us.

## VI.

### A.

---

[5] See also Grogan v. Blooming Grove Volunteer Ambulance Corps, 768 F.3d 259, 265 (2d Cir. 2014) ("[I]t cannot be said that [general ambulance] services are 'traditionally exclusive public function[s.]'"), cert. denied, ___ U.S. ___, 135 S. Ct. 1895, 191 L. Ed. 2d 764 (2015); Osler v. Huron Valley Ambulance Inc., 671 F. Supp. 2d 938, 943 (E.D. Mich. 2009) ("Ambulance service does not carry with it a badge of sovereignty. It does not amount to a 'power[] traditionally exclusively reserved to the State.'") (alteration in original) (quoting Jackson, supra, 419 U.S. at 352, 95 S. Ct. at 454, 42 L. Ed. 2d at 485); Krieger v. Bethesda-Chevy Chase Rescue Squad, 599 F. Supp. 770, 773-74 (D. Md. 1984) (holding that rescue squad that assisted firefighters on the scene did not serve traditionally public function), aff'd without opinion, 792 F.2d 139 (4th Cir. 1986).

25

EMTs commonly work for private, non-profit first-aid squads and hospitals, but they also work for government-related agencies. In addition, municipal governments contract with private organizations to provide ambulance services.[6] From a historical perspective, first-aid squad services have not been a traditional governmental function, much less an exclusive one. Under the principles stated in Perez, a municipality's contracting for emergency medical services in a community through a private, non-profit first-aid squad does not convert the EMTs into public servants because they are not exercising authority of a uniquely governmental nature or performing a function exclusive to government in any traditional sense.

The conclusion we reach is not inconsistent with State v. Quezada, supra, in which the Appellate Division held that a volunteer firefighter was a public servant for purposes of the official-misconduct statute. 402 N.J. Super. at 284-85. "New Jersey law has consistently recognized that firefighting is a public or governmental function." Eggert v. Tuckerton Volunteer

---

[6] "The results [of cities surveyed] showed that 39.6% (36) of the cities report that a private company transports their patients, followed closely by 37.4% (34) using the local fire department. Third-service and hospital-based providers make up 23% (21) of transport providers and include public-utility models that no longer contract out for services." Michael G. Ragone, Evolution or Revolution: EMS Industry Faces Difficult Changes, 37 J. Emergency Med. Servs., no. 2., 2012, at 34, 38.

Fire Co. No. 1, 938 F. Supp. 1230, 1238 (D.N.J. 1996); see also Schwartz v. Borough of Stockton, 32 N.J. 141, 150 (1960) (maintaining that "fire protection . . . is a governmental function" and that "principle necessarily extends to municipal arrangements with volunteer companies"); Vogt v. Borough of Belmar, 14 N.J. 195, 206 (1954) ("Protection against fire is a public governmental function.").  The panel majority of the Appellate Division in this case contrasted emergency medical services and firefighting services, noting that firefighting services are "overwhelmingly provided by public fire departments and volunteer fire companies, with only a handful of private businesses having their own firefighting organizations."

We decline to find that defendant was "performing a governmental function" and therefore a "public servant" merely because volunteer EMTs are subject to state regulations and receive certain legislative benefits and tort immunities that encourage citizens to undertake life-saving activities on behalf of the public.  State statutes, by various means, promote individuals and institutions to engage in charitable activity. Non-profit organizations, other than first-aid squads, such as hospitals, are highly regulated, see, e.g., N.J.S.A. 26:2H-1 to -26; receive state funding, see, e.g., N.J.S.A. 26:2H-18.58; and benefit from tort limitations, see, e.g., N.J.S.A. 2A:53A-8; and

27

yet no one would suggest that hospital employees are public servants subject to the official-misconduct statute.

Last, we disagree with the Appellate Division majority's suggestion that "a volunteer first aid and rescue squad that contracts with a municipality to be the sole or predominant provider of [emergency medical] services" in that municipality may be performing a sufficiently exclusive governmental function to transform its EMTs into public servants. By that reasoning, defendant was saved from the designation of "public servant" solely because the Pemberton Rescue Squad was performing back-up services to the Lourdes EMTs, who, by municipal contract, were providing primary services within Pemberton Township. Further, that reasoning would lead to the absurd result that had Lourdes been the sole provider of emergency medical services pursuant to a municipal contract, its EMTs would be public servants for purposes of the official-misconduct statute. The happenstance of whether there are one or more non-profit providers of publically funded emergency medical services in a municipality does not alter the equation that the EMTs are not exercising a uniquely governmental authority or performing a function exclusive to government in any traditional sense.

B.

In summary, defendant was not an employee of Pemberton Township. He was a member of a volunteer, non-profit first-aid

28

and rescue squad that received $25,000 pursuant to a municipal contract to provide back-up services to the Township. The Pemberton Rescue Squad was also funded through donation drives and any available federal grant monies. Although defendant allegedly committed a number of criminal offenses by misappropriating some of the First Aid Squad's funds in his capacity as the Squad's treasurer, he did not commit the offense of official misconduct because he was not performing a governmental function and therefore was not a public servant.

## VII.

For the reasons expressed, we affirm the judgment of the Appellate Division, which upheld the trial court's dismissal of the official-misconduct charge against defendant. We remand to the trial court for proceedings on the four remaining counts of the indictment.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE ALBIN's opinion.

29