# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2865-15T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

STEVEN R. DONALDSON,

     Defendant-Appellant.

_____

> Argued December 12, 2018 – Decided April 1, 2019
>
> Before Judges Accurso, Vernoia and Moynihan.
>
> On appeal from Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 13-10-1344.
>
> James K. Smith, Jr., Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Joshua D. Sanders, Assistant Deputy Public Defender, of counsel and on the brief).
>
> Alexis R. Agre, Assistant Prosecutor, argued the cause for respondent (Scott A. Coffina, Burlington County Prosecutor, attorney; Alexis R. Agre, of counsel and on the brief).

PER CURIAM

Defendant Steven R. Donaldson appeals following his jury-trial conviction for first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a), as a lesser included offense of first-degree murder, N.J.S.A. 2C:11-3(a)(1), (2), and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a), in connection with the death of a one-year-old child who was in his care when she suffered blunt force head trauma, which caused her death.[1] On appeal, he argues:

> POINT I
>
> [DEFENDANT] REPEATEDLY INVOKED HIS RIGHT TO REMAIN SILENT, THEREFORE THE STATEMENTS MADE DURING HIS INTERROGATION AFTER THESE REPEATED INVOCATIONS SHOULD HAVE BEEN SUPPRESSED.
>
> POINT II
>
> DEFENSE COUNSEL WAS UNCONSTITUTIONALLY INEFFECTIVE BY FAILING TO PROPERLY CROSS-EXAMINE A STATE'S EXPERT USING RELEVANT AND MATERIAL EVIDENCE THAT THAT EXPERT HAD PREVIOUSLY ERRED BY READING A SLIDE UPSIDE DOWN IN A MATTER WHERE THE

---

[1] In his merits brief, defendant states he did not dispute the cause of death at trial, only the manner of death.

A-2865-15T4

> INTERROGATION OF VARIOUS SLIDES WAS CENTRAL TO THE CASE.
>
> POINT III
>
> [DEFENDANT'S] SENTENCE IS EXCESSIVE AND MUST BE REDUCED.

We are unpersuaded by any of these arguments and affirm.

Defendant's challenge to the trial court's partial denial of his motion to suppress the statement he made to police is based on his invocation of the right to remain silent. The trial court summarized defendant's argument: detectives interrogating defendant failed to "scrupulously honor his constitutional rights and failed to [re-Mirandize[2]] him before continuing their interrogation" after, "on three occasions he invoked his <u>Miranda</u> rights" by telling the detectives he had "nothing to say," and twice "referenced calling his attorney."

After reviewing the entire video-recorded statement and a transcription of the audio portion, the court concluded, in "the context of the line of questioning and considering the totality of the circumstances[,] defendant made no request, not even an ambiguous one, to terminate questioning or remain silent, until the end of the interview." The trial court noted that defendant first uttered an invocation after more than two-and-a-half hours of questioning. The court found

---

[2] <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

defendant's words, in context, were "nothing more than an affirmation that he [had] told the police everything, that he was hiding nothing from them. Even after saying he had 'nothing more to say,' he continued to answer the detectives' questions." The court continued:

> Although detectives were under no Hartley[3] obligation to remind defendant of his Miranda rights, they nonetheless did so, the defendant responding, "We can continue talking, but I have nothing to say." That statement alone establishes the defendant himself did not equate "I have nothing to say" with the invocation of his right to remain silent. It clearly meant that he was willing to answer question[s] but had nothing to add to his story.

The court did suppress "the very few questions" that followed defendant's statement after he learned the child died: "I have nothing to say. [O]therwise then I . . . I guess I'll bring my attorney in to speak with you."

Our standard of review of a trial court's decision on a motion to suppress requires our deference to the court's factual findings so long as they are "supported by sufficient credible evidence in the record." State v. Gamble, 218 N.J. 412, 424 (2014). The deferential standard applies to factual findings based on a video-recorded statement. State v. S.S., 229 N.J. 360, 379-81 (2017). In

---

3 State v. Hartley, 103 N.J. 252 (1986).

contrast to the deference we show to trial courts as factfinders, "the task of appellate courts generally is limited to reviewing issues of law. Because legal issues do not implicate the fact-finding expertise of the trial courts, appellate courts construe the Constitution, statutes, and common law 'de novo — with fresh eyes . . . .'" Id. at 380 (quoting State v. Morrison, 227 N.J. 295, 308 (2016)). Reviewing the record evidence, we agree with the trial court that, in the context of the entire statement, defendant did not invoke his right to remain silent.

We recognize if, during an interrogation, a person makes "a request, 'however ambiguous,' to terminate questioning or to have counsel present[,] [it] must be diligently honored." Hartley, 103 N.J. at 263 (quoting State v. Kennedy, 97 N.J. 278, 288 (1984)). "Any words or conduct that reasonably appear to be inconsistent with defendant's willingness to discuss his case . . . are tantamount to an invocation of the privilege against self-incrimination." State v. Bey (Bey II), 112 N.J. 123, 136 (1988). If the police are unsure if a suspect invoked the right, they must either "(1) terminate the interrogation or (2) ask only those questions necessary to clarify whether the defendant intended to invoke his [or her] right to silence." S.S., 229 N.J. at 383.

In determining whether the right to remain silent was invoked, a court must analyze "the totality of the circumstances, including consideration of the suspect's words and conduct." State v. Maltese, 222 N.J. 525, 545 (2015). "The . . . statement [must be] evaluated in the full context in which [it was] made." Ibid. "Any words or conduct that reasonably appear to be inconsistent with defendant's willingness to discuss his case with the police, however, are tantamount to an invocation of the privilege against self-incrimination." S.S., 229 N.J. at 382 (quoting Bey II, 112 N.J. at 136).

Our Supreme Court has determined that words like those used by defendant were sufficient to invoke the privilege against self-incrimination. See Id. at 386 (holding suspect invoked right to silence when he stated "No, that's all I got to say. That's it"); State v. Johnson, 120 N.J. 263, 281 (1990) ("a suspect who has 'nothing else to say' . . . has asserted the right to remain silent . . . ." (citation omitted)); State v. Bey (Bey I), 112 N.J. 45, 64 (1988) (holding privilege invoked where suspect told police "he would have nothing to say"). In light of the questions to which defendant was responding when he spoke similar phrases, we cannot equate the statements made by the defendants in those cases with defendant's statements here.

Defendant's first said, "I told you everything," after hours of questioning about what occurred while defendant was watching the child, and the detective's lengthy discourse on the importance of truthfulness. A colloquy took place thereafter when the detective finally said, "So tell me what happened. Tell . . . tell me . . . ."

> [Defendant]: I told you everything.
>
> [Detective]: You . . . you . . . you didn't.
>
> A: I have nothing else to say.
>
> Q: Steve[,] you didn't tell me everything that happened.
>
> A: I have nothing else to tell you.
>
> Q: Well, tell me how this injury got to the baby.
>
> A: I have nothing else to say.
>
> Q: You . . . you don't know how this injury got to the baby?
>
> A: I told you everything.
>
> Q: Well, let's . . . and let me ask you this. Why don't you wanna tell me?
>
> A: It's not that I don't wanna tell you. I already told you everything.

These statements support the trial court's finding that defendant's assertions that he had nothing more to say were not an invocation of his right to

A-2865-15T4

remain silent but, rather, an indication that he "had nothing to add to his story." The lengthy conversation that followed this colloquy further evidences that defendant was not invoking his right to remain silent. During that conversation, the detective challenged defendant:

> With all your changes of your stories, with all your lies to me tonight I have a hard time believing that that's the entire story. And as [a] matter of fact[,] I'm going to go even further. I know that's not the entire story. Cause I now have a pretty good knowledge of what actually happened there tonight. I just need you to tell. You need to get out in front of this and we need to move on . . . . And . . . and we . . . and after we come to this truth . . . .

Defendant interjected, "That's everything I know." And after the detective replied, "we don't need to talk anymore," defendant reiterated, "that's everything I know of what happened sir." Defendant was not cutting off the conversation; he was telling the detective that he had been telling the truth and that he had nothing more to add to "the entire story."

After another lengthy exchange during which defendant stated, "I mean otherwise you can . . . talk to my attorney," the detective asked, "Is that your wishes?" Defendant replied, "No, not at all." The detective later followed up:

> Q: Okay, alright. Look, we started talking and you made the comment you can talk to my attorney to get the answers. And then I asked you is that what you want or do you want to talk to me? You said no sir I

wanna talk to you, but we need to clear that up. Remember those rights that I read you? You have those rights. I . . . I . . . you know, I'll go over em' again if you want me to, but one of those rights is you can have an attorney here present while I'm talking to you. So, based on that conversation that we just had[,] do you wanna talk to me now or do you wanna have an attorney here while you're talking to me? It's . . . it's your rights. We need to clear it up.

After defendant cut off a re-reading of <u>Miranda</u> warnings, confirming he knew them,[4] the detective started another discussion, asking:

> [Detective]: So, I'm asking you. Do you want to have your attorney here now or do you want to continue talking to me?
>
> [Defendant]: We can continue talking, but I have nothing else to say.
>
> Q: Okay. I understand that. And you're saying I have nothing else to say, because you feel there's no more information that you can provide . . . [n]ot that you don't wanna talk to me. Do you still wanna talk to me?
>
> A: I would . . . I'd gladly give you more information, but there's nothing else to tell you.
>
> Q: But, you understand that the more I talk to you the more information I get, because if I stop this when we first started talking. If I let you tell your story you know how much information I wouldn't have gotten? So, let's just clear this up. Do you or don't you wanna talk to me right now without talking . . . .

---

[4] Defendant does not contend he invoked his right to counsel.

A: How . . . much longer is this gonna be?

Q: I just need to clear up this . . . this last bit of information. I don't know how long that's gonna take. I just need to clear this last bit of information up, but I need to clarify. Do you or don't you wanna have an attorney here?

A: How much . . . how much longer?

Q: I can't tell you that, but I can tell you once I clear up this . . .

A: Well, can I get out here in a half hour or . . .

Q: Possibly. I . . . can't give you a time frame, but the quicker we get to the truth the quicker I can get you out of here.

A: Alright well, go ahead.

Q: Again, do you or don't you want an attorney here while we're talking and do you still wanna talk to me?

A: Right now I'll still talk, but . . .

Q: Okay. That's fine and you know you have that right. One of those rights is that any time you can tell me that. Okay?

A: Alright.

In further dialogue with the detective, the detective continued to tell defendant he was lying and defendant maintained his innocence. Defendant said

he was unaware if "a mistake or accident happened" and that "[n]othing was done on purpose," concluding, "[t]hat's all I can . . . say you guys, I'm sorry."

After defendant was informed the child had died, this final colloquy took place before defendant invoked his right to counsel:

> [Detective]: The truth is out there. You can hide behind it you have to get out in front of it. And as soon as you tell the truth the world changes for you and you're out in front of everything.
>
> [Defendant]: I have nothing else to say.
>
> Q: Why is that?
>
> A: I already explained everything.
>
> Q: You didn't explain what happened to the baby. That's the only thing.
>
> A: I don't know what happened.
>
> Q: The baby died. Something happened significantly in that apartment there tonight.
>
> A: I don't know what happened.
>
> Q: Look at me. Something happened.
>
> A: I don't know what happened.

The foregoing recital from the record clearly supports the trial court's finding that defendant never, even ambiguously, invoked his right to remain silent. The detective's questions give context to the selective passages defendant

A-2865-15T4

contends are proof that he invoked his right. Under the totality of the circumstances, as the trial court found, defendant did no more than inform the detectives that he was telling them all he knew – not that he did not want to speak with them – clarifying many times that the conversation could continue. The motion to suppress defendant's statement was correctly decided.

Defendant also argues his trial counsel was ineffective because he failed to properly cross-examine the State's expert in neuropathology, contending the expert's credibility "was central in this matter," and that counsel failed to question her about an error she made in an unrelated case when the expert read "slides upside down," thereby "improperly shield[ing] [the expert] from meaningful cross-examination as to her professional competency."

During trial, defense counsel attempted to question the expert about her role as the government's expert in an Illinois case. At a sidebar conference that followed the State's objection to that line of questioning, defense counsel explained why he wished to question the expert: because in a federal habeas corpus proceeding, the judge, acting as a factfinder, found the expert's opinions – made after she "viewed slides in a case involving a head injury to a child, the same type of thing that we have here" – "were erroneous because she had read the slides upside[-]down." We note the federal judge's exact finding was that

12

the expert was "completely unbelievable and unreliable. Her own testimony and later questioning . . . showed that she had viewed the autopsy photo of the brain sections upside-down and had drawn erroneous and unwarranted conclusions from this . . . ." Del Prete v. Thompson, 10 F. Supp. 3d 907, 946 (N.D. Ill. 2014). The trial court in this case sustained the objection, finding that the Del Prete case was "unrelated [and] not contrary to her testimony here. All it tells this [c]ourt is that in the opinion of a fact finder, who had to make choices, he found she wasn't reliable."

Defendant agrees that the trial court "properly precluded defense counsel from cross-examining the State's [expert] in relation to a prior judicial finding, from an unrelated case." He contends that trial counsel should have elicited that the expert "had previously read . . . autopsy slides upside down when formulating her expert opinion" because that information was "relevant to a proper assessment of her credibility in this case where the interpretation of slides was hotly contested." Instead, defendant's trial counsel informed the judge, "I'm not going to ask any other questions," and the expert was excused.

Defendant's ineffective-assistance-of-counsel argument was not raised to the trial court. The reason for counsel's decision to refrain from asking the expert about her averred error was never established. Nor was it developed

13

whether evidence of the expert's error would be admissible.  Indeed, a review of the federal judge's decision reveals that the expert read autopsy photos – not slides – upside down and the expert claimed microscopic slides "had been mislabeled."  Del Prete, 10 F. Supp. 3d at 942.  We cannot ascertain from the record if the circumstances of any error committed by the expert in the Illinois case was sufficiently relevant and material to allow for the now-proposed cross examination.

As such, we will not entertain defendant's ineffective assistance claim on such an undeveloped record.  See State v. Dixon, 125 N.J. 223, 261-62 (1991) (refusing to decide an ineffective assistance claim on direct appeal where record was "inadequate to disclose what reasons of tactic and strategy motivated counsel"); see also State v. Preciose, 129 N.J. 451, 460 (1992) ("Our courts have expressed a general policy against entertaining ineffective-assistance-of-counsel claims on direct appeal because such claims involve allegations and evidence that lie outside the trial record.").

As a final point, defendant contends his twenty-year sentence – the midrange of an ordinary term for aggravated manslaughter, N.J.S.A. 2C:11-4(c) – was excessive.  The trial court, concluding the aggravating factors outweighed the non-existent mitigating factors, found aggravating factors:   two,

vulnerability of the victim; three, risk that defendant will reoffend; and nine, need to deter, N.J.S.A. 2C:44-1(a)(2), (3), (9), set forth reasons for each finding. Defendant does not dispute the trial court's findings regarding the statutory factors. He simply argues, with no elaboration or explanation except to mention this is defendant's first indictable conviction, that defendant could be adequately punished with a lesser sentence. We determine defendant's argument is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2); see State v. Case, 220 N.J. 49, 65 (2014) ("When the aggravating and mitigating factors are identified, supported by competent, credible evidence in the record, and properly balanced, [an appellate court] must affirm the sentence and not second-guess the sentencing court, provided that the sentence does not 'shock the judicial conscience.'" (citation omitted) (quoting State v. Roth, 95 N.J. 334, 365 (1984))).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

15

A-2865-15T4